FOURTH DIVISION
FILED:  December 27, 2007

No. 1-06-1807

| | | |
|---|---|---|
| *In re* KEITH C., a Minor | ) | Appeal from the Circuit Court |
| | ) | of Cook County, Illinois |
| (The People of the State of Illinois, | ) | |
| | ) | |
| Petitioner-Appellee, | ) | No. 04 JD 5661 |
| | ) | |
| v. | ) | |
| | ) | Honorable Arthur Hill, |
| Keith C., | ) | Judge Presiding |
| | ) | |
| Respondent-Appellant.) | ) | |

JUSTICE MURPHY delivered the opinion of the court:

Respondent, Keith C., was adjudicated delinquent based on a finding that he had

committed the offenses of armed robbery (720 ILCS 5/18-2 (West 2004)) and aggravated battery

(720 ILCS 5/12-4(a), (b)(1), (b)(8) (West 2004)).  Respondent was adjudged a ward of the court

and sentenced to five years' probation.  On appeal, respondent contends that (1) the identification

evidence was insufficient, (2) the trial court erred when it refused to permit expert eyewitness

identification testimony, (3) his adjudication for aggravated battery should be reversed because

the victim's injuries were not "practically certain" to result from throwing a brick, (4) improper

hearsay was admitted, (5) the State made factual misrepresentations in its closing argument, and

(6) the compulsory extraction of his saliva and perpetual storing of his DNA profile violate his

1-06-1807

right to be free from unreasonable searches and seizures.

## I. BACKGROUND

The State filed a petition for adjudication of wardship alleging that respondent committed robbery, aggravated battery, and criminal damage to property. He was tried in separate, simultaneous hearings with his two co-respondents, Aaron J. and Tony B.

Guadalupe Leon testified through an interpreter that on September 5, 2004, she left a birthday party in Berwyn at about 9 p.m. She thought it took 45 minutes to drive to her home, located at 6635 South California in Chicago. She drove into the well-lit alley behind her house and saw four young men enter the alley, two on a bicycle and two men walking next to the bicycle. Leon identified respondent and his two co-respondents in court as three of the boys.

As she drove past the boys, one of them kicked her bumper, but she was not afraid because she thought they were playing. She "barely saw" the face of the boy who kicked her car, but she recognized the boy riding the bicycle as co-respondent Tony B. She proceeded to open her garage with a remote control and pulled in. She let her husband out since he had to go to the restroom. When she pulled the car out of the garage to straighten it, she saw the boys leaning against her neighbor's garage, which adjoined hers, "all in the light." She testified that there was "plenty of light" in the alley outside the garage, and the inside of the garage was illuminated when she opened the garage door.

She was looking behind her, in the process of parking, when she heard a noise by the door. Someone opened her car door, and one of the boys grabbed her purse, with her cell phone clipped to the strap, from inside the car. He ran and dropped the purse in the middle of the

garage. She attempted to get out of the car to retrieve her purse, but one of the boys went and picked it up. At that moment, a brick hit the windshield, breaking the glass, and "whatever emanated from that brick" hit her in the head. Everything became blurry, and she began bleeding from her ear. She saw the offenders from behind as they ran away. She did not see who threw the brick.

Leon braced herself against the walls of the garage as she went into the house and called her son, Ernesto. She went back to the car, where a man, who had called an ambulance, was helping her husband. She lay down in the car because she was unable to stand. By the time she was in the ambulance, she had her purse back, but the cell phone was no longer clipped to the strap.

Leon's son, Ernesto, a police officer, testified that he was on duty at about 9:30 p.m. when his mother called his cell phone in a "nervous panic." He hung up with her, called 911, and drove to his parents' house with his lights and sirens activated. He arrived in less than 15 minutes and found the garage door open and the light in the garage on. His mother's car was crashed into the neighbor's fence. The windshield was broken and there was an indentation where the roof connects to the front windshield. He saw two halves of a brick inside the garage. His mother, "kind of passed out" in the passenger seat, had blood coming out of her right ear. Leon called the police department and requested a paramedic and police.

Ernesto attempted to talk to his mother to keep her conscious while they waited for the ambulance. After the ambulance arrived, he heard children at the front of the building calling out to someone in the building. He went to the front of the building and saw a boy and a girl. The

girl was holding a black purse, which Leon determined was his mother's. His mother's cell phone was missing from the purse and he did not find it in her car. He went with his mother to the hospital, where she received four staples above her right ear.

Detective Kampenga of the Chicago police department testified that on September 15, 2004, he showed Leon an array of 18 photos. He did not tell her that she had to pick someone out, nor did he tell her that there was a suspect in the array. She did not identify anyone from this array. Neither respondent nor his co-respondents were pictured in the array.

Kampenga testified that Ernesto Leon provided him with the records for the stolen cellular phone to determine whether any calls were made with it after it was stolen. Kampenga investigated two phone numbers that were dialed from Leon's stolen phone. He then spoke to respondent and his mother. Based on this information, he searched the Chicago police department's CLEAR database for Aaron J. and obtained a photo of him, which he included in a second photo array. On September 28, 2004, Kampenga showed Leon the array of five photos. He did not tell her there was a suspect in the array, nor did he tell her she needed to pick someone out. Leon identified co-respondent Aaron J. as one of the perpetrators.

Kampenga then went to Aaron J.'s home and spoke to Anthony B., the father of Keith's two co-respondents, Tony and Aaron. Anthony B. gave Kampenga a cellular phone, which Leon later identified as hers. Tony and Aaron arrived home soon thereafter with respondent. Kampenga brought the three boys to the police station and conducted a six-person lineup composed of Keith, Tony, and Aaron, and three additional people. Leon identified respondent and co-respondents.

Kampenga interviewed Keith, who stated that he was with his friends Aaron and Tony when he found the cell phone in the middle of the alley on the night of September 5, 2004. He could not remember what time this occurred, but it was dark out.

At the close of the State's case, respondent moved to allow testimony from Dr. Gerald Loftus, a psychologist. Respondent argued that Loftus would have explained the "transference effect," *i.e.*, how someone could mistakenly remember a person from one time and place when the sighting was in a different context. He also would have described how an officer can unconsciously influence a lineup. The trial court noted that the proposed expert had not spoken to Leon or the police detectives involved. The court questioned the relevance and helpfulness of Loftus's proposed testimony because "I don't know, as I'm sitting here right now, whether or not the police might have done something suggestive that they, maybe unconsciously, didn't know." It also noted that the proposed testimony would be a "scholarly recitation about something that has everyday impacts" and found that it was well aware of general issues as they relate to eyewitness identification. Therefore, it barred the testimony.

Respondent then called Chicago police officer Shawn Monroe, who mentored respondent. Monroe testified that after respondent's arrest, he talked to someone from the neighborhood, who said that a man named Donte had done additional robberies and burglaries. He informed a police detective and asked him to do a new lineup, but the detective refused "because it would kind of mess the case up." Monroe testified that he did not file a report against the detective for official misconduct, nor did he create any supplemental police reports or general progress reports based on this information.

Respondent's mother testified that on September 5, 2004, she and respondent arrived home from her parents' house at 9:45 or 10 p.m. Respondent went to his room for a second and then went outside. She thought respondent was on the porch with co-respondents for a few minutes, but she was not sure. Before she went to bed, at about 10 p.m., she saw respondent on her neighbor's porch. She fell asleep but heard him come in and go to his room.

Respondent's neighbor, Lorraine Stokes, testified that on September 5, 2004, she was at home from 7:30 to 10:30 p.m. Tony and Aaron were on her porch from 7:30 to 9 p.m. She testified that at 9, they moved to a neighbor's porch, but admitted that she did not see them leave. Respondent arrived later; she saw him at 10 p.m. but did not see him arrive. Tony and Aaron's mother called at 10:30, but when she looked out the window, the boys were gone.

Stokes testified that the three boys did not have a "reputation" in the community. They were close friends who played together, often at Marquette Park, which is at 67th and California. When they walked to Marquette Park to play basketball, they would walk south on Fairfield from the 65th Street block to 66th and Fairfield. She did not see their route past her block.

Finally, respondent testified on his own behalf. He stated that on September 5, 2004, he left the home of his grandmother, who lives two to five minutes from him, at about 9:30 p.m. When he arrived home, he went to a friend's house on Fairfield, about seven houses from his house. Co-respondents were already there. He stayed on the porch of that house for 15 or 20 minutes and left with co-respondents, at about 10 or 10:15, and went to the store on 67th and California, which was two blocks from the friend's house. At 10:15, as they walked through the alley between California and Fairfield, he found a cell phone. He picked it up and called his own

cell phone to test it, and then gave it to Aaron. When he was walking through the alley, he did not see an ambulance or police car. He denied any involvement in a robbery.

The trial court found respondent guilty of aggravated battery and robbery. It sentenced respondent to serve the minimum disposition, five years' probation, and ordered him to complete 20 hours of community service. This appeal followed.

## II. ANALYSIS

### A. Sufficiency of the Evidence

Defendant presents two challenges to the sufficiency of the evidence: (1) the sufficiency of the identification and (2) proof that he "intentionally or knowingly" committed aggravated battery. "It is the jury's function to determine the accused's guilt or innocence, and this court will not reverse a conviction unless the evidence is so improbable as to justify a reasonable doubt of defendant's guilt." *People v. Frieberg*, 147 Ill. 2d 326, 359 (1992). "When a defendant challenges the sufficiency of the evidence, the relevant inquiry is whether, after viewing the evidence in the light most favorable to the prosecution, any rational trier of fact could have found the essential elements of the crime [proven] beyond a reasonable doubt." *People v. Woods*, 214 Ill. 2d 455, 470 (2005). A court of review will not overturn the fact finder's verdict unless "the proof is so improbable or unsatisfactory that there exists a reasonable doubt as to the defendant's guilt." *People v. Maggette*, 195 Ill. 2d 336, 353 (2001).

### 1. *Identification evidence*

The prosecution has the burden of proving beyond a reasonable doubt the identity of the person who committed the crime. *People v. Slim*, 127 Ill. 2d 302, 306 (1989). A single witness's

identification of the accused is sufficient to sustain a conviction if the witness viewed the accused under circumstances permitting a positive identification. *Slim*, 127 Ill. 2d at 306. However, an identification will be insufficient to support a conviction if it is vague and doubtful. *Slim*, 127 Ill. 2d at 306. The reliability of a witness's identification of a defendant is a question for the trier of fact. *People v. Cosme*, 247 Ill. App. 3d 420, 428 (1993). Furthermore, it is the function of the trier of fact to assess the credibility of the witnesses, the weight to be given their testimony, and the inferences to be drawn from the evidence. *People v. Tenney*, 205 Ill. 2d 411, 428 (2002). The trier of fact must also resolve conflicts or inconsistencies in the evidence. *Tenney*, 205 Ill. 2d at 428.

Circumstances to be considered in evaluating an identification include the following: (1) the opportunity the witness had to view the criminal at the time of the crime; (2) the witness's degree of attention; (3) the accuracy of the witness's prior description of the criminal; (4) the level of certainty demonstrated by the witness at the identification confrontation; and (5) the length of time between the crime and the identification confrontation. *Slim*, 127 Ill. 2d at 307-08.

Respondent contends that the first and second *Slim* factors weigh in his favor because Guadalupe Leon had no opportunity to view the criminals "at the time of the crime." While she did not see which particular boys opened the car door, snatched her purse, or threw the brick, she did have two opportunities to view them just before the robbery occurred. First, she identified respondent and his two co-respondents as the boys who were in the alley when she first entered it. Second, just before the robbery, when she pulled the car out of the garage to straighten it, she saw the same boys leaning against her neighbor's adjoining garage, "all in the light." Although it

was dark out when the incident occurred, Guadalupe Leon testified that the alley had "plenty of light," and the victim's son testified that the garage light was still on when he arrived. See *People v. Barnes*, 364 Ill. App. 3d 888, 894 (2006) (testimony based on "night observations illuminated only by artificial light may serve as proof of identification beyond a reasonable doubt").

While respondent makes much of Guadalupe's lack of fear when the boy kicked her bumper, it is significant that she was in close proximity to the boys when she first saw them. In addition, even if she only thought the boys were playing, having one's bumper kicked would draw one's attention to the person doing the kicking.

As for the fourth factor, Guadalupe identified respondent in the lineup and at trial. When she was presented with the first photo array, which did not contain pictures of respondent or his co-respondents, Guadalupe did not pick anyone out. However, respondent contends that 23 days, the period of time between the robbery and the lineup, was "more than sufficient to degrade the reliability of her memory." We disagree. Where two-year lapses of time between the crime and the identification have been upheld (*Slim*, 127 Ill. 2d at 313-14; *People v. Wardell*, 230 Ill. App. 3d 1093, 1098 (1992)), we find that the passage of 23 days between the robbery and the lineup did not adversely affect the identification.

No evidence was presented as to the witness's prior description of the criminals, the third *Slim* factor, except that they were four boys. While respondent cites *United States v. Crozier*, 259 F.3d 503, 512 (6th Cir. 2001), a federal case holding that the lack of any pretrial description undermines a later identification, he does not cite any Illinois law. In addition, *Crozier*, while noting that the lack of a previous description "indicates a measure of unreliability" in the witness's

identification, still upheld the defendant's conviction. *Crozier*, 259 F.3d at 512. Because all circumstantial facts should be considered to determine the sufficiency of an identification (*People v. Ward*, 371 Ill. App. 3d 382, 415 (2007)), we find that this factor, while weighing in respondent's favor, does not render "the proof *** so improbable or unsatisfactory that there exists a reasonable doubt as to the defendant's guilt." *Maggette*, 195 Ill. 2d at 353.

Respondent also argues that the identification evidence was unreliable because Guadalupe Leon was confused as to events that occurred before she was hit on the head. He cites her testimony that she and the boys entered the alley at the same time and that when she encountered them, they were going north and she was going south. To the extent that this testimony was inconsistent, we note that it is for the trier of fact to resolve conflicts or inconsistencies in the evidence. *Tenney*, 205 Ill. 2d at 428. Respondent also points to Ernesto Leon's testimony that he asked his mother on the way to the hospital "what time *** she [left] my grandmother's house and what can she remember" and she "started telling me and went to the alley north on it, meaning she wasn't there. So I left it alone." Why Guadalupe Leon "wasn't there" based on this testimony is unclear. She admitted that once she received the blow to her head, everything became blurry, an expected physical reaction under the circumstances. However, we do not believe that the witness's confusion renders her testimony of what occurred before the blow to her head invalid.

Finally, respondent claims that the identification procedures raised the possibility that Guadalupe Leon mistakenly identified him by association rather than recognition. He first contends that by placing co-respondent Aaron in both the photo array and the lineup, the police

demonstrated their suspicion of Aaron. We have held, however, that lineups "from which the defendant is identified as the perpetrator are not rendered inadequate merely because the defendant is the only person in the lineup whose photograph was previously shown to the person viewing the lineup." *People v. Curtis*, 262 Ill. App. 3d 876, 883-84 (1994). Respondent goes on to argue that because defense witnesses testified that the three boys were frequently together, once Leon linked Aaron to the offense, "she could easily have assumed" that his two friends were involved. No evidence was presented to suggest that Leon had seen any of the boys before the night of the robbery, let alone that she had seen the three of them together. Respondent, who did not move to exclude the identification evidence, bases his argument on speculation. Therefore, we reject his argument.

Although respondent argues that his testimony was plausible and partially corroborated, we reiterate that it is the function of the trier of fact to assess the credibility of the witnesses, the weight to be given their testimony, and the inferences to be drawn from the evidence. *Tenney*, 205 Ill. 2d at 428.

## 2. *Proof of mental state for aggravated battery*

Respondent next argues that his adjudication for aggravated battery should be reversed because the State failed to prove beyond a reasonable doubt that he "intentionally or knowingly" caused great bodily harm or used a deadly weapon to cause bodily harm.

Section 12-4(a) of the Criminal Code of 1961 provides that a "person who, in committing a battery, intentionally or knowingly causes great bodily harm, or permanent disability or disfigurement commits aggravated battery." 720 ILCS 5/12-4(a) (West 2004). A "person ***

acts knowingly or with knowledge of *** [t]he result of his conduct, described by the statute defining the offense, when he is consciously aware that such result is practically certain to be caused by his conduct." 720 ILCS 5/4-5(b) (West 2004).

By its very nature, "knowledge" is ordinarily proved by circumstantial evidence, rather than by direct proof. *People v. Nash*, 282 Ill. App. 3d 982, 985 (1996). "The State must present sufficient evidence from which an inference of knowledge can be made, and any inference must be based upon established facts and not pyramided on intervening inferences." *People v. Weiss*, 263 Ill. App. 3d 725, 731 (1994).

Respondent contends that whoever threw the brick could not have been "practically certain" that his conduct would cause bodily harm because Leon testified that when the brick was thrown, "[i]t first hit the car, breaking the glass. And I think that the, whatever emanated from that brick hit me on the head." The State responds that it "strains credulity" that a person could throw a rock at an occupied car without being "practically certain" that the occupant would suffer great bodily harm.

In *People v. Hauschild*, 364 Ill. App. 3d 202 (2006), *rev'd in part on other grounds*, 226 Ill. 2d 63 (2007), the defendant argued that his conviction for criminal damage to property for shooting a homeowner's dog during a home invasion should be reversed because the State failed to prove the requisite mental state. The defendant told the police that a dog was present in the homeowners' bedroom when he first entered. The room was "pitch black," and a struggle ensued between the defendant and one of the homeowners. During the struggle, the defendant shot at the homeowner. The court held that it was not unreasonable for the jury to conclude that the

defendant or his accomplice knew that the dog remained in the bedroom during the shooting. *Hauschild*, 364 Ill. App. 3d at 220. "Furthermore, given the chaotic environment, it was not unreasonable for the jury to conclude that defendant or [his accomplice] knew that blindly discharging multiple gunshots was 'practically certain' to injure the animal." *Hauschild*, 364 Ill. App. 3d at 220. See also *People v. Lesley*, 144 Ill. App. 3d 22, 23 (1986) ("We have no difficulty in finding that the defendant acted knowingly or that it was practically certain that great bodily harm would result to the driver from the forceful throwing of rocks at an occupied bus").

Similarly, we find that it was "practically certain" that throwing a brick at the windshield of an occupied car would result in great bodily harm to the driver. Furthermore, when the brick was thrown, Leon's car door was open, leaving her even more unprotected from, and likely to be injured by, a thrown brick. While the record does not contain a description of the brick's size and weight, it was thrown with sufficient force to cause it to break when it hit the windshield.

### B.  Expert Witness

Respondent next argues that the trial court should have allowed Dr. Gerald Loftus to explain identification transference, eyewitnesses' propensity to select a lineup participant unless admonished, and how an officer can influence a lineup. The proposed witness did not generate a report; the hearing transcripts refer to a motion, an offer of proof, and a curriculum vitae, which were apparently filed by Tony and joined by respondent. However, none of these documents is in the record on appeal.

Generally, an expert will be permitted to testify if his or her experience and qualifications afford him or her knowledge that is not common to laypersons and where such testimony will aid

the trier of fact in reaching its conclusion. *People v. Enis*, 139 Ill. 2d 264, 288 (1990). A trial court is given broad discretion when determining the admissibility of expert testimony, and when considering the reliability of the expert testimony, the court should balance its probative value against its prejudicial effect. *Enis*, 139 Ill. 2d at 290. The court should also consider the necessity and relevance of the expert testimony in light of the facts of the case before it before admitting it. *Enis*, 139 Ill. 2d at 290. "[A] trial court's decision to allow or exclude eyewitness identification expert testimony must be made on a case-by-case basis." *People v. Tisdel*, 338 Ill. App. 3d 465, 468 (2003).

In *Enis*, our supreme court ruled that the trial court properly barred expert testimony regarding the reliability of eyewitness testimony. The expert would have testified that the relationship between witness confidence and accuracy is insignificant; the higher the stress level, the less accurate the memory; an identification is usually worse if a weapon is present; and jurors give too much weight to time estimates. *Enis*, 139 Ill. 2d at 285. However, the expert testimony would not have aided the trier of fact in reaching its conclusion because none of the eyewitnesses was in a high stress situation when they saw a person running or in a parking lot. *Enis*, 139 Ill. 2d at 288. Only one witness testified that he saw a weapon, but he was not near the defendant, and he was unaware that a crime had been committed. *Enis*, 139 Ill. 2d at 288-89. There was little relevance to time estimates of how long something took to occur, and although witness confidence may have been present, it did not believe that this factor alone demanded that the defendant be given a new trial. *Enis*, 139 Ill. 2d at 289.

"Trial courts should carefully scrutinize the proffered testimony to determine its

relevance–that is, whether there is a logical connection between the testimony and the facts of the case." *Tisdel*, 338 Ill. App. 3d at 468. Similar to the proposed testimony in *Enis*, Dr. Loftus's proposed testimony was not relevant to the evidence adduced at trial. For example, according to respondent, testimony about "transference effect" would have explained how the respondents' frequent presence in Leon's neighborhood could have caused a mistaken identification. At trial, respondent argued, "What is this whole idea of unconscious transference when someone mistakenly believes they have seen someone at one point in time when they have really seen them at a different point in time?" However, Leon never testified that she had ever seen the boys before.

Respondent also claims that the expert could have testified about how police can affect the lineup. At trial, respondent argued that the expert could tell the court what facts it should be listening to or considering from the testimony, for example, the lighting or whether violence was involved. There was, however, little testimony as to how the lineup was conducted. Indeed, Kampenga, the only officer to testify, was not even with Leon when she identified respondent and his co-respondents in the lineup.

Finally, according to respondent, the expert could have described how an eyewitness tends to pick someone in a lineup and how police admonishments reduce that propensity. While evidence was presented that Kampenga admonished Leon that she did not have to pick anyone out of the photo arrays, there was no testimony as to whether the admonishment was repeated for the lineup. Although respondent argues that "[t]his discrepancy could have communicated" to Leon that she lacked permission to decline an identification, we refuse to speculate, in the absence

of any evidence, whether Leon was admonished at the lineup. Therefore, the proposed testimony would be based on speculation instead of "the facts of [the] case." *Tisdel*, 338 Ill. App. 3d at 468.

Defendant also contends that the trial court abused its discretion because it used improper legal criteria by "demand[ing] first-hand knowledge of facts from the defense expert," evaluating the relevance of the evidence by weighing the State's evidence, and relying on inadmissible hearsay. We disagree. In commenting on Dr. Loftus's failure to talk to the witnesses, the trial court noted that there was no evidence that "the police might have done something suggestive that they, maybe unconsciously, didn't know." We find that the trial court did not err when it "carefully scrutinize[d]" the proposed testimony and specifically found that it was irrelevant and would not assist the court. *Tisdel*, 338 Ill. App. 3d at 468.

In a motion to cite additional authority, respondent relies on *People v. Allen*, No. 1-06-1943 (September 28, 2007). In *Allen*, we criticized the trial court for failing to comply with *Tisdel*'s mandate to carefully scrutinize the proposed expert testimony on eyewitness identification. Although the balancing test requires a weighing of the probative value against its prejudicial effect, the trial court in *Allen* did not carefully scrutinize the probative value and relevance of the testimony before concluding, with "no considered basis," that the proposed testimony would confuse the jury. *Allen*, slip op. at 27-28. "Because of the trial court's failure to conduct a meaningful inquiry into [the expert's] proposed testimony, under the specific circumstances of this case," we reversed the defendant's conviction and remanded for a new trial. *Allen*, slip op. at 28. *Allen*'s holding is limited, however: "We simply hold that the offer of proof

must be given serious consideration." *Allen*, slip op. at 28. *Allen* expressed no opinion on whether the trial court should allow any part of the offer of proof to be heard by the jury. *Allen*, slip op. at 28.

*Allen* reinforces our conclusion as to the admissibility of Dr. Loftus's proposed testimony. The trial court heard respondent's motion before trial and, after extensive arguments, declined to make a decision until after hearing the State's witnesses. When the State concluded its case, the trial court asked the parties to address the issue again. After having two hearings on this issue and reading the curriculum vitae, motion, and appropriate case law, the trial court found the testimony to be irrelevant. Therefore, we find that, unlike the trial court in *Allen*, the trial court in this case gave the proposed testimony serious consideration before it determined that it was not relevant.

Furthermore, certain parts of the expert's report in *Allen* were relevant and referred to commonly accepted misconceptions. For example, the proposed expert's report in *Allen* presented data concerning weapon focus, stress, and the relationship between witness confidence and witness accuracy, issues that the State stressed in closing argument. *Allen*, slip op. at 24-25. However, other data and conclusions did not fit the facts of the case; for instance, data supporting the unreliability of cross-racial identifications would not fit because there was no indication that the expert considered that the Korean eyewitness was married to an African American. *Allen*, slip op. at 24. As we explained above, Loftus's proposed testimony on identification transference, eyewitnesses' propensity to select a lineup participant unless admonished, and how an officer can influence a lineup did not fit any evidence adduced at trial. Finally, we note that unlike the

witness in *Allen*, who was not asked to identify the defendant in person until she saw him at counsel's table, in a jail uniform, at a hearing eight months after the crime (*Allen*, slip op. at 24), Guadalupe Leon identified one co-respondent in a photo array and identified all three in a lineup less than a month after the robbery.

The trial court did not abuse its discretion in refusing to admit the testimony.

### C. Hearsay

Respondent contends that the trial court erred when it allowed Kampenga, over respondent's objection, to testify that when he showed Leon the cellular phone that co-respondents' father gave him, she identified it as hers.

Hearsay evidence is testimony regarding an out-of-court statement offered to prove the truth of the matter asserted. *People v. Sullivan*, 366 Ill. App. 3d 770, 779 (2006). Hearsay is generally inadmissible unless an exception applies. *Sullivan*, 366 Ill. App. 3d at 779. The primary rationale for the exclusion of hearsay testimony is the inability of the opposition to test the testimony's reliability through cross-examination of the out-of-court declarant. *Sullivan*, 366 Ill. App. 3d at 779. We review the evidentiary hearings of a trial court deferentially and reverse only if the trial court abuse its discretion, resulting in manifest prejudice to the accused. *People v. Tolliver*, 347 Ill. App. 3d 203, 222 (2004).

As a preliminary matter, the State contends that respondent waived this argument because he did not object at trial. Respondent responds that an objection would be futile because the trial court overruled co-respondent's objection to the question on hearsay grounds. Regardless of whether respondent waived his claim, however, we find that reversible error did not occur

because Leon testified at trial and was available for cross-examination. "[W]here the declarant is available in court or there is an opportunity to ascertain the veracity of the testimony by cross-examination, there is no hearsay problem." *People v. Hodor*, 341 Ill. App. 3d 853, 862 (2003).

Respondent relies on *People v. Lawler*, 142 Ill. 2d 548 (1991), in support of his argument that the presence or absence of the declarant is irrelevant to a determination as to whether the out-of-court statement is hearsay. *Lawler*, 142 Ill. 2d at 557. While the declarant's availability for cross-examination does not change the characterization of the evidence as hearsay (*Lawler*, 142 Ill. 2d at 557), the ability to cross-examine the declarant is relevant in determining whether the admission of hearsay was harmless. *People v. Collins*, 265 Ill. App. 3d 568, 580 (1994). Furthermore, in *Lawler*, the error was not harmless because "much of the State's case was dependent upon the substantive use of the complainant's phone conversation with her father." *Lawler*, 142 Ill. 2d at 562. Leon unequivocally identified respondent and co-respondents as the perpetrators. Therefore, we find that the admission of the testimony was harmless.

### D. The State's Closing Argument

Respondent argues that the State made two factual misrepresentations in its closing argument. The State's evidence shows that the robbery occurred at approximately 9:45 p.m. Although Keith testified that he was in the alley at 10:15 p.m., the State argued in closing that he "put himself in the alley when the crime occurred." In addition, the State argued that to go from Lorraine Stokes's house to Marquette Park, the boys always walked down Fairfield instead of walking through an alley at California. Stokes testified, however, that she did not know their route past her block.

1-06-1807

Respondent waived this issue because he failed to object to either statement. *In re W.C.*, 167 Ill. 2d 307, 323 (1995). Respondent claims that objections would have been futile because the judge's "exasperated response" to counsel for Tony B. disinvited any similar objections; however, he does not cite any authority that one may dispense with contemporaneous objections and assert error on appeal merely because a co-respondent has suffered adverse rulings regarding objections to other statements. "[T]he requirement of a contemporaneous objection promotes judicial economy and the swift and fair administration of justice. We are hesitant to undermine these objectives by allowing [respondent] to base his choice whether to object not on the merits of the objection but on a general appraisal of the trial court's inclinations." *People v. Cloutier*, 178 Ill. 2d 141, 164 (1997). Therefore, we agree with the State that this claim of error has been waived.

Waiver notwithstanding, we find that the trial court did not err. It is well settled that prosecutors enjoy wide latitude in closing arguments, and the scope of permissible arguments rests within the sound discretion of the trial court. *People v. Walker*, 262 Ill. App. 3d 796, 804 (1994). A reviewing court will not reverse a jury's verdict based on improper remarks made during closing arguments unless the comments resulted in substantial prejudice to the defendant and constituted a material factor in his conviction. *People v. Brooks*, 345 Ill. App. 3d 945, 951 (2004). In a bench trial, the trial judge is presumed to have considered only competent evidence, and this presumption may be rebutted only where the record affirmatively demonstrates the contrary. *In re J.A.*, 316 Ill. App. 3d 553, 566 (2000). The record does not contain such a contrary showing.

Respondent argues, however, that the record rebuts the presumption because the court "lacked a sufficient grasp of the evidence" when it overruled Tony B.'s objections to two additional statements that the State made in closing. We do not find the trial court's overruling of Tony B.'s objections to be evidence of its "shaky grasp" of the evidence; to the contrary, in overruling one of the objections, the trial court specifically noted, "The evidence has been in. I have heard the evidence. I know it."

We conclude that respondent waived his argument regarding the State's closing. Even if he had not waived the argument, the record does not affirmatively rebut the presumption that the trial judge only considered relevant evidence.

### E. DNA Testing

Lastly, respondent contends that the extraction of his saliva for DNA testing pursuant to section 5-4-3 of the Unified Code of Corrections (730 ILCS 5/5-4-3 (West 2004)) violates his right to be free from unreasonable searches and seizures. Respondent acknowledges that our supreme court found the statute constitutional in *People v. Garvin*, 219 Ill. 2d 104 (2006), but argues that his juvenile status distinguishes *Garvin*. This issue is currently pending before our supreme court. See *In re Lakisha M.*, No. 103541 (leave to appeal granted November 29, 2006).

We review the constitutionality of a statute *de novo*. *Garvin*, 219 Ill. 2d at 116. It is generally presumed that a statute is constitutional, and it is respondent's burden to show that it violates the constitution. *Garvin*, 219 Ill. 2d at 116.

The Second District addressed this issue in *In re Robert K.*, 336 Ill. App. 3d 867 (2003). In *Robert K.*, the court rejected the respondent's argument that his status as a minor provided him

with a greater constitutional right to privacy than offenders who have already reached the age of majority. *Robert K.*, 336 Ill. App. 3d at 872. "The juvenile court system is a purely statutory creation and the legislature has the authority to define its limits." *Robert K.*, 336 Ill. App. 3d at 872. Accordingly, any rights provided under the Juvenile Court Act of 1987 (705 ILCS 405/1 *et seq.* (West 2000)) are not of constitutional dimension. *Robert K.*, 336 Ill. App. 3d at 872. More recently, this court similarly rejected a juvenile's argument in *In re Clifton R.*, 368 Ill. App. 3d 438, 440 (2006). Consistent with *Robert K.* and *Clifton R.*, we find that respondent has failed to establish that section 5-4-3 is unconstitutional as applied to him.

### III. CONCLUSION

For the foregoing reasons, we affirm the decision of the trial court.

Affirmed.

NEVILLE, J., and CAMPBELL, J., concur.