2021 IL App (1st) 181010-U

No. 1-18-1010

Order filed February 23, 2021

Second Division

**NOTICE:** This order was filed under Supreme Court Rule 23 and is not precedent except in the limited circumstances allowed under Rule 23(e)(1).

_____

IN THE

APPELLATE COURT OF ILLINOIS

FIRST DISTRICT

_____

| | | |
|---|---|---|
| THE PEOPLE OF THE STATE OF ILLINOIS, | ) | Appeal from the |
| | ) | Circuit Court of |
| Plaintiff-Appellee, | ) | Cook County. |
| | ) | |
| v. | ) | No. 16 CR 14145 |
| | ) | |
| EDDIE HOWLETT, | ) | Honorable |
| | ) | James B. Linn, |
| Defendant-Appellant. | ) | Judge, presiding. |

_____

PRESIDING JUSTICE FITZGERALD SMITH delivered the judgment of the court. Justices Pucinski and Cobbs concurred in the judgment.

**ORDER**

¶ 1     *Held*:   We affirm defendant's conviction for first degree murder where the evidence at trial was sufficient to prove his guilt beyond a reasonable doubt.

¶ 2     Following a bench trial, defendant Eddie Howlett was found guilty of three counts of first

degree murder and one count of mob violence. The court merged the counts into a single count of

first degree murder (720 ILCS 5/9-1(a)(1) (West 2016)), and sentenced defendant to 20 years' imprisonment thereon. On appeal, he contends that the State's evidence was insufficient to sustain his conviction because no eyewitnesses, physical evidence, or inculpatory statements connected him to the murder, and video evidence was too "grainy" to identify him. We affirm.

¶ 3 Defendant and Erik Anderson were charged by indictment with three counts of first degree murder and one count of mob action arising from the killing of Kimberly Schnackenberg on April 21, 2016.[1]

¶ 4 At trial, the State entered stipulations to the foundation for videos from April 21, 2016, taken from several cameras located at or near the scene of the murder (People's Exhibit Nos. 1-4), and a separate exhibit containing clips from the other videos (People's Exhibit No. 5). These videos, which were published throughout the trial, are included in the record on appeal.

¶ 5 Daniel Gonzalez testified that late in the evening of April 21, 2016, he and his girlfriend were walking to a liquor store and noticed a body in an alley behind a coach house on the 2000 block of West 51st Street. Gonzalez saw it was Schnackenberg, whom he knew for six or seven years and recognized by her tattoos because her face was "badly beaten." Schnackenberg resided at the coach house, and Gonzalez previously lived there. Gonzalez, who had been drinking and smoking marijuana, did not immediately call the police because he had a warrant for violating probation for an aggravated DUI conviction, but he contacted the police later that night.

¶ 6 On April 22, 2016, Gonzalez went to a police station and viewed two video surveillance clips, including one depicting Schnackenberg's death. In both clips, Gonzalez recognized "E,"

---

[1] Anderson was found guilty following a separate but simultaneous bench trial, and is not a party to this appeal. Anderson's first name is spelled in different ways throughout the record, and we adopt the spelling used in his separate appeal, currently pending under appeal No. 1-18-1963.

whom he identified in court as defendant and had bought drugs from almost daily. Gonzalez recognized defendant in both clips by "his swag and his hair," which were "unique." Defendant was one of the only men Gonzalez knew who wore his hair in a bun. Gonzalez also stated that he "could see [defendant] two blocks down" and recognize him "by his walk and slenderness."

¶ 7 The State published portions of People's Exhibit No. 1, surveillance footage from the alley where Gonzalez found Schnackenberg's body. In the video, Gonzalez identified the coach house and also identified defendant, who stood beside a Grand Am, wearing a black short-sleeved shirt, light-colored jeans, and his hair in a rubber band. Next, the State published still frames from People's Exhibit No. 1. In one frame, Gonzalez identified defendant and Schnackenberg, and in another, Gonzalez identified defendant and two men he knew as "D" and "L."

¶ 8 Gonzalez further testified that on April 26, 2016, he saw footage that showed defendant punch Schnackenberg after "exiting the property." On May 13, 2016, Gonzalez met with detectives and identified E in a photo array as the person he knew and saw in the video. He also identified L in a photo array. Gonzalez stated that he did not receive consideration in his aggravated DUI case for testifying at defendant's trial.

¶ 9 On cross-examination, Gonzalez testified that he lived for about a year at the coach house, which had "a lot of drug use." During his stay, more than 100 people visited the house, and some would stay for more than an evening. Schnackenberg, who worked as a prostitute, used drugs and would sell her extra drugs, but was not a "dealer." After finding Schnackenberg's body, Gonzalez walked three blocks and used someone else's phone to anonymously call 911. The next day, he went to a police station.

¶ 10    Chicago police officer Kevin Killen testified that he had known Schnackenberg for several years as she worked as a confidential informant. He began surveilling defendant after receiving a tip that he was selling narcotics, which Schnackenberg corroborated. From October 2015 to April 2016, Killen observed defendant over 30 times. Killen identified defendant in court.

¶ 11    On April 28, 2016, Killen met with investigators and viewed three videos. The first video depicted Schnackenberg's murder in the alley, and showed defendant punching her. Killen identified defendant because of his unique appearance, specifically his pulled back, braided hair and slim build. In the second video, from a camera on Damen facing 51st, Killen again identified defendant based on his hair and slim build. In the third video, from inside a liquor store, Killen "easily" identified defendant "[f]rom his face." The State published two video clips from People's Exhibit No. 1, depicting the alley, and Killen identified defendant wearing a "short-sleeve black T-shirt." Killen stated that he also identified defendant in a photograph shown to him by Detective Daniel Kienzle.

¶ 12    On cross-examination, Killen testified that defendant frequented the area of 51st and Damen. While surveilling defendant, Killen did not film him, create a contact card, or produce documentation aside from a search warrant for his residence on the 5200 block of South Wood, about two blocks from Damen.

¶ 13    Chicago police detective Andrew Burns Jr. testified that he investigated Schnackenberg's murder. The State published a map on which Burns identified the location of surveillance cameras in the area of the murder. Using footage from the videos contained in People's Exhibit Nos. 1-4, Burns produced a timeline of events surrounding the murder. Clips from the footage were compiled

into a single sequential video contained on People's Exhibit No. 5. The State published that video, and Burns described the events therein.

¶ 14    The first two clips in the compilation, from a bank on the west side of Damen and a liquor store on the east side of Damen, respectively, depict the corner of Damen and 51st. At 7:38 p.m., a black SUV followed by a Pontiac Grand Am turn from Damen onto 51st, going west towards Homan Avenue.

¶ 15    The third clip, from an auto repair shop, shows the two vehicles travel westbound on 51st and turn south onto Hoyne. Burns explained that immediately after turning, the vehicles would have reached the alley behind Schnackenberg's house.

¶ 16    The fourth clip in the compilation, from People's Exhibit No. 1, depicts the alley and the coach house. At 7:39 p.m., the two vehicles stop in the alley. Six men, including the man whom Gonzalez and Killen identified as defendant in the same clip, exit the vehicles. That man wears a black t-shirt, light-colored pants, and his hair in a bun. Another man wears white pants and a black jacket. A third man, wearing a gray sweater with black shoulders and black elbow pads, points to a location off screen, west of the coach house, and all the men reenter the vehicles and drive east in the alley at approximately 7:43 p.m.

¶ 17    Clips five through seven, comprising footage from the bank and liquor store, depict the SUV traveling east down the alley and then north on Damen before turning east on 51st.

¶ 18    Clips 8 through 11, comprising footage from the bank, liquor store, and auto repair shop, depict four individuals walking westbound in the alley behind the liquor store at approximately 8:02 p.m. A fifth person wearing a letterman jacket with white sleeves follows, and the end of an object is visible behind his right shoulder. At 8:04 p.m., the first four men—including one who

appears to be the man identified as defendant based on his build, hair, and outfit, along with the man wearing white pants and a black shirt—walk north on Damen, pass the liquor store, and turn west on 51st. At 8:05 p.m., four men turn south onto Hoyne; while the man identified as defendant is not specifically discernable, the man in the white pants and black shirt is visible.

¶ 19    The twelfth clip, from People's Exhibit No. 1, shows the alley behind the coach house at 8:08 p.m. The four men meet the man in the letterman jacket, and all five men go out of sight behind the east side of the couch house. Then, three of the men, including the man in the letterman jacket and the man in the white pants, emerge and hide west of the coach house. A fourth man emerges from east of the house and walks west, out of the frame. Around that time, the man identified as defendant, whose hair and clothing are the same as in previous clips, enters the frame with Schnackenberg from the east side of her house and punches her in the face. She falls to the ground, and the three men emerge. The man in the letterman jacket hits Schnackenberg with a bat, another man kicks her, and the man identified as defendant and the man in white pants stand nearby. The four men flee west towards Hoyne at 8:11 pm.

¶ 20    Clips 13 and 14, from the auto repair shop, show one man walking from Hoyne on 51st towards Damen, followed by a group of four men that includes the man in white pants. Clips 15 through 17, comprising footage from the bank and liquor store, show a group of three men, including the one in white pants, walking east and meeting at 51st and Damen at 8:14 p.m.

¶ 21    The eighteenth clip, from outside the liquor store, depicts the man with the letterman jacket with his jacket open, exposing a gray sweater with a black top, and a man in a black hooded sweater with a black flat-billed hat walking south on Damen at approximately 8:22 p.m. The nineteenth clip shows two men walking eastbound in the alley behind the liquor store at 8:23 p.m.

¶ 22    Clips 20 through 24, from inside the liquor store, show the man identified as defendant enter at approximately 8:41 p.m. His hair is in a bun, and he wears a black coat with a black shirt beneath and light jeans. He is followed by the man wearing the gray sweater with a black top and black elbows, and the man in the black hooded sweater and black flat-billed hat. The man identified as defendant grabs a bottle of water, hands it to the man in the gray sweater, and pays for the water before all three men leave the store.

¶ 23    Burns further testified that he interviewed defendant in custody on May 24, 2016. The interview was filmed and portions were published to the court.[2] In the interview, defendant identified himself in a photograph from the liquor store and stated that he went to Hoyne to investigate a shooting. According to defendant, he knew Schnackenberg and she "used to smoke." He texted Schnackenberg that he needed her "to test some," but she did not respond to the text. Defendant denied being in the alley and participating in any attack.

¶ 24    On cross-examination, Burns testified that defendant said a shooting occurred in the alley on April 20, 2016, and he went to the alley that day. Burns also interviewed Gonzalez, who identified someone as L from video shown to him. That person was interviewed and provided an alibi.

¶ 25    Detective Kienzle testified that he recovered Schnackenberg's cellphone from her room in the coach house on April 22, 2016, and he reviewed the messages on it. He identified three pictures taken of the phone. The first screenshot showed the phone's contact list, which included an

---

[2] The record on appeal includes two exhibits that contain footage of defendant's statement: People's Exhibit No. 5, which contains the portions of the interview related in this order, and People's Exhibit No. 14, which contains approximately nine hours of footage of defendant in custody and being interviewed. While People's Exhibit Nos. 5 and 14 were both entered into evidence, the transcript does not specify which exhibit was played when the State published portions of Howlett's interview.

individual named "E" and listed his phone number as (561) 425-0204. The other two screen shots showed a text message received by Schnackenberg from E that occurred on April 21 at 7:51 p.m., stating, "I nd u to test sum Kim Wya."

¶ 26    During his investigation, Kienzle viewed footage showing vehicles in the alley. On April 22, 2016, he located two vehicles, which appeared to be the ones in the video, parked near each other on the 5100 block of South Winchester. The two vehicles were a black GMC Yukon with license plate number E673326 and a silver Pontiac Grand Am. On April 28, 2016, Kienzle showed Killen footage of Schnackenberg's murder, and Killen identified one of the individuals in the video as defendant. Kienzle then showed Killen a photograph of defendant, and Killen again identified him.

¶ 27    The State admitted vehicle records showing a 2005 GMC with the license plate of E673326 was registered to Anderson. The State also entered stipulations that a phone registered to Nicole Solomon with the number (561) 425-0204 utilized towers and sectors consistent with the phone being in the vicinity of the 2000 block of 51st from approximately 6:41 p.m. through 11:28 p.m. on April 21, 2016.

¶ 28    The State entered a stipulation that Schnackenberg's roommate, Willie Evans, would testify that he found her body in a pool of blood in the alley at 1:29 a.m. on April 22, 2016, and called 911. The State also entered a stipulation that Dr. Matthew Fox would testify that he performed Schnackenberg's autopsy and determined the cause of death was craniocerebral blunt force injuries due to multiple impacts to the head, and the manner of death was homicide.

¶ 29    Defendant admitted a copy of the search warrant that was served at his residence.

¶ 30    The court found defendant guilty of three counts of first degree murder and one count of mob action, specifically, that he "sucker punched" Schnackenberg during her murder. The court observed that video evidence showed the same group of people, as identified by their clothing, acting in concert before, during, and after the crime. The court acknowledged that defendant identified himself in an image from a tape and "it was the same people together again and again and again. These were the same guys."

¶ 31    Defendant filed a motion to reconsider, which was denied. The court merged the counts into a single count of first degree murder (720 ILCS 5/9-1(a)(1) (West 2016)), and sentenced defendant to 20 years' imprisonment thereon.

¶ 32    On appeal, defendant argues he was not proven guilty beyond a reasonable doubt where there were no eyewitnesses to the murder, physical evidence, or inculpatory statements, and the video evidence was "grainy."

¶ 33    At the outset, defendant submits that the trial court's findings based on the video evidence are not entitled to deference on review because "trial courts do not occupy a position superior to the appellate courts in evaluating evidence that is not live testimony." See, *e.g.*, *People v. Shaw*, 2015 IL App (1st) 123157, ¶ 29 (the appellate court "give[s] less deference to a trial court's determinations of fact when they are based on evidence other than live witness testimony"). The State, relying on *Jackson v. Virginia*, 443 U.S. 307, 318-19 (1979), maintains that all the evidence must be viewed in the light most favorable to prosecution. In this case, the evidence included videos but also testimony about their content and the identities of the individuals depicted. Consequently, the trial court was required to evaluate the credibility of the witnesses and weigh their testimony in making its findings, and the standard of review articulated in *Jackson* applies.

¶ 34    Where a defendant contests the sufficiency of the evidence presented against him, the appellate court must ask whether, after reviewing the evidence in the light most favorable to the State, any rational trier of fact could have found each element of the crime proven beyond a reasonable doubt. *Id*. The trier of fact is responsible for determining the witnesses' credibility and the weight given to their testimony, resolving conflicts in the evidence, and drawing all reasonable inferences from the evidence. *People v. Ortiz*, 196 Ill. 2d 236, 259 (2001). We will not substitute our judgment regarding the weight of the evidence or the credibility of the witnesses. *People v. Brown*, 2013 IL 114196, ¶ 48. The appellate court "must allow all reasonable inferences from the record in favor of the prosecution." *People v. Davison*, 233 Ill. 2d 30, 43 (2009). Ultimately, a reviewing court " 'will not reverse a conviction unless the evidence is so improbable, unsatisfactory, or inconclusive that it creates a reasonable doubt of defendant's guilt.' " *People v. Lloyd*, 2013 IL 113510, ¶ 42 (quoting *People v. Collins*, 214 Ill. 2d 206, 217 (2005)).

¶ 35    A defendant commits first degree murder if, in performing the acts that cause a death, he intends to kill or do great bodily harm to the victim, or knows that such acts will cause the victim's death. 720 ILCS 5/9-1(a)(1) (West 2016); *People v. Joiner*, 2018 IL App (1st) 150343, ¶ 59. Defendant does not challenge the evidence supporting the elements of the offense, but rather, his identification as an offender.

¶ 36    The prosecution has the burden to prove beyond a reasonable doubt the identity of the person who committed the crime. *People v. Slim*, 127 Ill. 2d 302, 307 (1989). Although an identification cannot sustain a conviction if it is vague or doubtful (*id.*), "[t]he reliability of a witness's identification of a defendant is a question for the trier of fact" (*In re Keith C.*, 378 Ill. App. 3d 252, 258, (2007)).

¶ 37 In *People v. Thompson*, 2016 IL 118667, our supreme court explained that a trier of fact can consider a lay witness's opinion testimony for the purposes of identifying another individual in a photograph or surveillance recording where the testimony is rationally based on the perception of the witness and helpful to a determination of a fact at issue. See *Thompson*, 2016 IL 118667, ¶¶ 50, 54. A lay witness's identification is helpful where he has had contact with the defendant that the trier of fact would not possess, which "achieve[s] a level of familiarity that renders the opinion helpful." *Id.* ¶ 50. Relevant factors include the witness's overall familiarity with the defendant; the witness's familiarity with the defendant's appearance when the recording was created; "whether the defendant was disguised in the recording or changed his/her appearance between the time of the recording and trial"; and "the clarity of the recording and extent to which the individual is depicted." *Id.* ¶ 51. Although the supreme court listed these factors in considering the admissibility of identification testimony, they provide some guidance for evaluating the challenge to the sufficiency of the identification testimony in the case at bar. See, *e.g.*, *People v. Murray*, 2019 IL 123289, ¶¶ 32-34 (finding that decisions analyzing the admissibility of expert opinion testimony were "instructive" in considering whether such testimony was sufficient to support a conviction).

¶ 38 The trial evidence showed that Schnackenberg died from craniocerebral blunt force injuries due to multiple impacts to the head. On video, a man walks with her in the alley behind her house and punches her in the head, whereupon she falls to the ground. A different man hits her with a baseball bat, and another man kicks her.

¶ 39 Gonzalez, who viewed the video, identified defendant as the man walking with Schnackenberg due to his gait and distinctive hair style. Around the date of the video, Gonzalez

interacted with defendant on a near daily basis and was generally familiar with him. Killen, who observed defendant over 30 times, corroborated this identification, and was generally familiar with defendant and his unique hairstyle and build. At the time of the offense, the man whom Gonzalez and Killen identified as defendant did not disguise his appearance, and there is no evidence that defendant changed his appearance prior to trial, when Gonzalez and Killen identified him in court. In the clip compilation, the man identified as defendant is in the company of men who wore the same outfits, before, during, and after the attack, and Killen identified defendant in multiple clips. The trial court, moreover, viewed all the clips, was aware of the video quality for each clip, and could evaluate the witnesses' testimony in light of them. Taking Gonzalez's and Killen's testimony in the light most favorable to the State, the trial court could reasonably credit their identifications of defendant.

¶ 40    While defendant notes the absence of physical evidence, none was necessary for the State to prove his guilt. *People v. Williams*, 182 Ill. 2d 171, 192 (1998) ("Proof of physical evidence connecting a defendant to a crime has never been required to establish guilt."). Moreover, other evidence supported his guilt. During his interrogation, defendant identified himself in an image from inside the liquor store. In video from the liquor store, he has the same distinct hairstyle from throughout the clips and wears a black shirt and light jeans. Furthermore, defendant admitted to texting Schnackenberg shortly before her death and cellphone records established that he was in the area of the offense throughout the time of death. See *People v. Denis*, 2018 IL App (1st) 151892, ¶ 63 (a conviction may be based on circumstantial evidence). In light of this evidence, we cannot say that no reasonable trier of fact could determine defendant was the man who initially hit Schnackenberg and was therefore guilty of first degree murder.

¶ 41    For the aforementioned reasons, the judgment of the circuit court of Cook County is affirmed.

¶ 42    Affirmed.