2026 IL App (2d) 240364
No. 2-24-0364
Opinion filed March 30, 2026

IN THE

APPELLATE COURT OF ILLINOIS

SECOND DISTRICT

THE PEOPLE OF THE STATE OF ILLINOIS, Plaintiff-Appellee,

v.

CARLOS J. ACOSTA, Defendant-Appellant.

Appeal from the Circuit Court of McHenry County.
Honorable George D. Strickland, Judge, Presiding.
No. 20-CF-703

JUSTICE SCHOSTOK delivered the judgment of the court, with opinion.
Presiding Justice Kennedy and Justice McLaren concurred in the judgment and opinion.

**OPINION**

¶ 1     Following a bench trial, defendant Carlos J. Acosta was convicted of one count of felony child endangerment (720 ILCS 5/12C-5(a)(1), (2) (West 2018)) and was sentenced to 6 months in jail and 30 months of probation. On appeal, defendant contends that the State failed to prove him guilty beyond a reasonable doubt. For the following reasons, we affirm.

¶ 2                                    I. BACKGROUND

¶ 3     Defendant was employed as a child protective investigator[1] with the Department of Children and Family Services (DCFS) at their Woodstock office, a position he had held since 2012.

---

[1]Also referred to in statutes, rules, procedures, and in trial testimony in the instant case as a "DCFS investigator," "child protection specialist," "investigative worker," or "child protection staff," such

On December 18, 2018, he was assigned to investigate a report of potential abuse and neglect of A.J., a boy, age 5. Because this was the third DCFS case involving A.J., defendant's investigation and report are collectively referred to as "C-sequence." Defendant was not alleged to have participated in either of the prior investigations, the A- and B-sequences.[2]

¶ 4       A.J. was born on October 14, 2013, to Andrew Freund (Drew) and Joann Cunningham (nee Summerkamp) (Joann). DCFS first opened an investigation regarding A.J. shortly after his birth because both he and Joann tested positive for "opiates and benzos" and A.J. was experiencing withdrawal symptoms. Hospital staff, as mandated reporters, reported that Joann had a history of heroin use and had fresh track marks despite her denial of heroin use during the pregnancy. After an investigation, the report was "indicated." DCFS took A.J. into protective custody while he was still in the hospital on November 12, 2013, and advised the parents of an upcoming court date. A.J. was placed in foster care with Joann's cousin. Approximately a year and a half later, on June 12, 2015, the court returned A.J. to Joann and Drew's custody. The case was closed the following year, on April 21, 2016.

¶ 5       Almost two years later, on March 21, 2018, DCFS opened a B-sequence investigation after learning that Joann was in the emergency room after being found asleep in her car. She was transported to Centegra Memorial Hospital, where staff observed fresh track marks on her arms,

employees are members of a regional "Child Protective Service Unit" and are "specialized State employees of the Department assigned by the Director to perform the duties and responsibilities as provided under Section 7.2 of th[e] Act." 325 ILCS 5/3 (West 2018); see *infra* ¶¶ 83-88.

    [2]Defendant's supervisor and co-defendant, Andrew Polovin, was the DCFS supervisor overseeing all three investigations. Polovin was tried on the same three charges in the same trial on the same evidence as defendant but was acquitted.

feet, and neck, and she was still wearing a West Suburban Hospital patient identification band dated three days earlier. Drew came to the hospital and brought A.J., now 4.5 years old, and A.J.'s younger brother, P.F., age 3. The reporter stated that both children were very dirty and their clothes were on inside out. A.J. "had odd bruising to his face and forehead" and nursing notes reported that "the children seemed very guarded with their father." The B-sequence report noted Joann's history of heroin abuse, her denial of drug use, her refusal to take a urine test, and her explanation that "someone must have put something in her drink." The report further noted that Joann had multiple arrests for domestic battery and theft from 2012-2017. DCFS closed the case on May 18, 2018, as unfounded because the children were not with Joann when she was found and because she entered a "detox and a treatment program."

¶ 6    On December 18, 2018, DCFS opened the C-sequence investigation. DCFS assigned defendant to investigate after Crystal Lake police officer Kimberley Shipbaugh took protective custody of A.J., now 5 years old, and his brother at Centegra Hospital because she observed a very large bruise on A.J.'s torso, heard conflicting explanations for the bruising, observed that Joann did not look "clean," and found the home "disgusting." Defendant's involvement from this point on is at issue in this case, as will be discussed further below. In sum, defendant allowed the protective custody to lapse that day, which returned the children to Joann's custody. In his report, *inter alia*, defendant indicated that there was insufficient credible evidence as to how A.J. had been harmed. He noted that A.J. had been examined by an emergency room doctor but that the examination was inconclusive. Further, the Crystal Lake Police Department had not filed charges against Joann. Defendant noted that he had visited the home on December 19, 2018. Although the home appeared cluttered, he did not believe that it was dangerous or unsafe. The report referred to the two prior DCFS investigations: one was determined unfounded and the other indicated. The

report also stated that Joann had a prior mental health diagnosis and exhibited extreme behavior. On January 4, 2019, defendant and his supervisor closed the case as unfounded.

¶ 7    On April 15, 2019, Joann beat A.J. to death. A forensic pathologist found that A.J. died of "craniocerebral trauma (head injuries) due to multiple blunt force injuries to the head *** consistent with child abuse." Joann would subsequently plead guilty to first degree murder and was sentenced to 35 years in prison.[3]

¶ 8    On September 10, 2020, defendant was charged by indictment with two felony counts of endangering the life or health of a child in that he (count I) "knowingly caused or permitted the life or health of [A.J.], a minor child under the age of 18, to be endangered and said offense was a proximate cause of the death of [A.J.]," and (count II) "knowingly caused or permitted [A.J.] *** to be placed in circumstances that endangered A.J.'s life or health and said offense was a proximate cause of the death of [A.J.]." 720 ILCS 5/12C-5(a)(1), (2) (West 2018). When commission of the offense of endangering the life or health of a child "is a proximate cause of the death of the child," it is a Class 3 felony. *Id.* § 12C-5(d). Defendant was also charged with one count of reckless conduct, a Class 4 felony, in that he "recklessly performed an act that caused great bodily harm or permanent disability" to A.J. *Id.* § 12-5(a)(2).[4]

---

[3]Drew later pleaded guilty to involuntary manslaughter, aggravated battery, and concealment of homicidal death, and was sentenced to 30 years in prison.

[4]All three counts alleged that defendant was "not acting in good faith within his official capacity as a DCFS Child Protection Specialist and in a willful and wanton manner." The question of immunity was not raised on appeal. See 325 ILCS 5/9 (West 2018) ("Any person, institution or agency, under [the Act], participating in good faith in the making of a report or referral, or in the investigation of such a report or

- 4 -

¶ 9                                    A. Trial

¶ 10   From September 11 to October 13, 2023, the trial court conducted a bench trial on the charges against defendant and his co-defendant/supervisor. The parties stipulated to defendants' job titles and duration; the identities and relationships of Joann, Drew, and A.J.; and the foundation of various exhibits, subject to standing defense objections, including the DCFS A-, B-, and C-sequence investigation reports, police reports, hospital records, reports from the Law Enforcement Agencies Data System (LEADS), and dozens of DCFS internal procedures.

¶ 11                                    1. Kimberley Shipbaugh

¶ 12   Crystal Lake police officer Kimberley Shipbaugh testified that, on December 18, 2018, at around 8 a.m., she went to Taco Bell in response to a theft report. Upon arrival, Shipbaugh saw Joann standing outside a four-door sedan. A.J and his brother, P.F., were inside the vehicle dressed only in t-shirts and diapers, despite the cold temperature. Joann had called 911 from inside the Taco Bell. She was crying and upset. She told Shipbaugh that her boyfriend, Daniel Nowicki, came to her home demanding money and took her prescription medications and phone. The prescription medications were Suboxone, a medication for heroin addicts, and Adderall, which she described as an antidepressant. Joann stated that Nowicki had moved out of the residence one week earlier.

¶ 13   Shipbaugh followed Joann back to her house. On the way to the house, Shipbaugh ran a LEADS inquiry and learned that Joann's driver's license was suspended. Shipbaugh was also in contact with another officer who had talked with Nowicki. Nowicki accused Joann of stealing *his* Suboxone.

_____

referral *** and except in cases of wilful or wanton misconduct, shall have immunity from any liability, civil, criminal or that otherwise might result by reason of such actions.").

¶ 14    Upon arriving at the house, Joann gave the officers consent to enter the house and ensure that Nowicki was not inside. He was not there nor was anyone else. Shipbaugh described the house as "disgusting" and noted that the kitchen floor was "torn up"; there were holes in the ceiling, piles of clothes, and urine and feces on the floor; there was an "atrocious smell" and broken windows; the upstairs children's room was in "disarray," with a mattress on the floor; it was cold in the house; and the garbage was "overflowing with diapers." Roaming around the house was a slender "boxer-type dog" that appeared to weigh approximately 60 pounds. Joann said the dog must have defecated on the floor while she and the kids were at Taco Bell. Another police officer took photos of the residence.

¶ 15    After Shipbaugh asked about the cold temperature inside the home, Joann closed the kitchen and upstairs windows. Joann blamed the dog, Lucy, for the floor being torn up. The children were inside the home "running around playing" and did not seem afraid of Joann. P.F. put on a "whole bunch of clothes" while A.J. had taken off his t-shirt and was wearing just a diaper.

¶ 16    While in the kitchen, Shipbaugh noticed a "horrific bruise" on A.J. that stretched from his hip up into his ribs and to the back of his hips. Shipbaugh testified that she asked A.J. what happened to his side. After pausing, A.J. looked to Joann, who looked at him and said, "Lucy did that to you, didn't she?" A.J. nodded and said, "Yes." Shipbaugh did not believe the bruise was caused by the dog. She testified that she should have pulled A.J. aside and asked him outside of Joann's presence.

¶ 17    Shipbaugh testified that another officer called building and zoning due to the condition of the home, but when they arrived at 8:47 a.m., Joann denied them entry.

¶ 18    At 9:20 a.m., Shipbaugh arrested Joann for driving on a suspended license and took protective custody of the children due to the bruise on A.J. and the condition of the home. She did

not believe that the house was safe for children. At the police station, Joann and the children were placed in separate rooms. Shipbaugh asked both Joann and A.J. about A.J.'s bruise. Joann was "adamant" that she had "no idea how the bruise had happened." A.J. again said that he must have gotten the bruise from the dog jumping on him.

¶ 19    Shipbaugh called DCFS, stated that she had taken protective custody of the children, and explained the situation. She stated that Joann "looked like a heroin addict." She also indicated that Nowicki and Drew had been living at the residence with Joann and the children.

¶ 20    Shortly after calling DCFS, Shipbaugh received a call from defendant. She informed him about what had happened and told him that she had made a "terrible mistake" when she asked A.J. about the bruise in front of his mother. She told defendant that she did not believe that a dog caused the bruise.

¶ 21    Around 11:06 a.m., defendant arrived at the station, and Shipbaugh left him to do his interviews with A.J. and P.F. Defendant interviewed Joann around 11:38 a.m. and finished a little after noon. After the interviews, defendant told Shipbaugh that he was going to allow protective custody to lapse. He stated that he was going to release the children to Joann with the stipulation that she have a doctor look at A.J.'s bruise. Shipbaugh objected, asserting that there was no way the children should be released to Joann without knowing how the injury occurred, especially since it was "clearly" not caused by the dog, and no child should be in the "disgusting residence."

¶ 22    Around 12:53 p.m., a family friend arrived at the station to transport Joann and the children to the hospital. Defendant did not ask Shipbaugh for a LEADS sheet or request any police reports. He was at the station for less than an hour.

¶ 23   On December 20, 2018, Shipbaugh called defendant to find out the status of the medical examination. Defendant indicated that the doctor who examined A.J. was not a forensic specialist and could not determine how the injury occurred.

¶ 24   Shipbaugh did not file charges in the case because she needed more detailed information. She did not refer the case to the Children's Advocacy Center (CAC) because it was not police protocol. She did not recall seeing the notification from DCFS in January 2019 that it had determined the case to be unfounded.

¶ 25                           2. Dr. Joellen Channon

¶ 26   Dr. Joellen Channon testified that she was an emergency physician. She stated that she was not an expert in child abuse but would at times physically examine and conduct well-being checks on children at the request of DCFS. On December 18, 2018, she was working in the emergency room at Centegra Hospital in McHenry County when she received a DCFS referral from defendant, asking her to determine the cause of A.J.'s injury. This was atypical because determining the cause of an injury was not her specialty. She asked defendant why he was asking her to determine the cause of the bruise because it did not require immediate attention. Defendant told her that protective custody of the child could continue if she were able to prove that the bruise was from nonaccidental trauma.

¶ 27   Joann, A.J., and P.F. arrived at the hospital at 2 p.m. Channon learned that there were concerns about the condition of the child's residence and drugs were potentially involved. Channon noted that Joann seemed nervous that her kids would be taken from her and asked to check herself in to the emergency room and be tested for drugs to prove that she was not on drugs. Joann told her that she was not sure what caused the bruising on A.J., but said that the kids were roughhousing, playing football, and that the dog may have jumped on him.

¶ 28 In examining A.J., Channon noted a bruise on his upper lip and a "darker" bruise across his right hip. She could not say whether the hip bruise was "suspicious in nature." She explained that bruising development and progression was "very complicated" and not something she would "feel comfortable making a judgment on." She described the bruising in her report as mild because it was not threatening to life or limb and did not require intervention.

¶ 29 Channon interviewed A.J. in a private room. In responding to her questions, A.J. acknowledged that he had been spanked before with a belt and that was what had "made the mark." When she asked who did it, A.J. said, "Someone not in my family," and then volunteered, "Maybe mommy didn't mean to hurt me." Channon asked a few more questions, and A.J. "went back to the story about the dog and really stopped talking." Channon stopped asking A.J. questions because she was "worried" that it would "tamper with the evidence." She knew there were people trained to question children who could do so "much better than [she] could." At the time, Channon believed the information she gathered from A.J. could be used to continue the protective custody because the mother was potentially "the abuser."

¶ 30 After interviewing A.J., Channon contacted defendant and requested that another medical exam be performed on A.J. by a forensic specialist and that he be interviewed again by a forensic interviewer. She told defendant that she would not let A.J. leave the emergency room with Joann. Defendant responded that there was no forensic interviewer available and that he would determine where A.J. would go.

¶ 31 Later, defendant informed Channon that Drew would come to the hospital to pick up A.J. after work. When Drew arrived at the hospital, Channon spoke to him and found there were "no red flags" for him. At this time, Channon believed that A.J. was still in protective custody. Nowicki was also in the emergency room that day but in a different department. Channon knew Nowicki

was Joann's boyfriend, and Nowicki told Channon he was living with Joann. Channon assumed that Drew did not live with Joann and Nowicki.

¶ 32                                    3. Chad Reeves

¶ 33    Reeves was Drew Freund's Alcoholics Anonymous sponsor. On December 18, 2018, Drew asked him to go to the police station to pick up the boys and Joann. He had been asked "numerous times" over the prior few years to do similar things because Joann "relapsed a couple years earlier." He testified that Drew was not "a real good handyman," so Reeves would help out with repairs at their house sometimes. Reeves typically drove Drew to get Suboxone once a month.

¶ 34    When Reeves arrived at the police station, he observed that Joann "[l]ooked a little strung out," which he had seen before. He drove Joann and the boys to the hospital for "a bruise" on A.J. He asked Joann what had happened, to which she replied, "Oh, boys being boys, you know." Reeves did not go into the hospital and had no further contact with the family.

¶ 35                                    4. Carole Ruzicka

¶ 36    Carole Ruzicka testified as an expert in DCFS child abuse allegations. Ruzicka retired from DCFS in August 2019, after working there since 1988. During her time at DCFS, she supervised investigators and ensured all investigative procedures were completed. She supervised "probably thousands" of investigations and investigated approximately 50 cases herself.

¶ 37    She testified that the "Procedures 300" (P300s) outlined the DCFS investigative process insofar as "what needs to be done from start to finish, *** what documents need to be obtained, who needs to be interviewed, [and] timelines for when things should be done." She stated that "Appendix B" outlined the investigation tasks associated with specific types of allegations. The P300s were "critical" to DCFS investigations. The P300s were mandatory, though there were

things that could be waived. In addition to the "minimal duties" in the P300s, investigators were also expected to use "common sense, investigative, and clinical skills."

¶ 38 DCFS had 48 hours from when police took protective custody to determine whether to let the protective custody lapse or not, explaining "you would have to move pretty quick on some tasks such as interviewing all parties, trying to obtain records, [and] finding a place—a safe place for the child to be," as well as consult with the state's attorney's office. She testified that allowing temporary custody to lapse is "a critical decision that ultimately is made by a supervisor." She examined People's Exhibit 32, a text message between defendant and Polovin. On December 18, 2018, at 11:30 a.m., defendant texted Polovin the photograph of A.J. taken at the police station, showing the large torso bruising, adding only, "Kid said big dog put his paw on me. I take that to mean a scratch." Five minutes later, Polovin replied, "Looks nasty, but if that's what the kid says." She further testified that a medical examination was required and that defendant was required to attend said medical examination, which he did not, nor did he acquire A.J.'s medical records.

¶ 39 Ruzicka believed that defendant's investigation was insufficient, protective custody should not have been allowed to lapse, and the case should have been indicated, meaning that "something either happened or more likely than not happened." She testified that if protective action was taken, the services that could have and should have been provided to the family would have prevented A.J.'s death in April 2019.

¶ 40 Based on her review of the C-sequence report, Ruzicka testified that defendant made numerous mistakes. Defendant failed to obtain and review prior investigative sequence reports or conduct a LEADS inquiry for Nowicki and Drew. He failed to interview the A-sequence investigator and his documented discussion with the B-sequence investigator was insufficient. He also failed to request and secure any existing police reports that would have shown a history of

police interactions with Joann, Drew, and Nowicki that involved allegations of domestic violence, mental health disorders, substance abuse, retail theft, suicidal ideation, and complaints about the condition of the home.

¶ 41    Additionally, Ruzicka noted that defendant failed to notify the state's attorney's office of the report of potential abuse or neglect. He did not comply with the P300 standards. He failed to speak with Nowicki or Chad Reeves. He failed to make an unannounced visit to Joann's home. His report did not indicate that he observed a dog at the residence. Further, he did not have an adequate consultation with his supervisor to determine if protective custody was warranted.

¶ 42    Ruzicka testified that defendant should have recognized that Joann's credibility was lacking when he created her substance abuse summary report. Joann had stated that she was not on any medications and had never participated in substance abuse or methadone programs. However, a prior sequence report indicated that she had entered treatment and the current case stemmed from her medications being stolen. Joann also gave contradictory statements about the cause of A.J.'s bruise. The medical reports (not obtained by defendant) indicated that Joann claimed she did not know how the bruise happened, but defendant's reports reflect only Joann's explanation that a dog caused the bruise.

¶ 43    Ruzicka further testified that the domestic violence screening form was inaccurately completed. The form failed to indicate a history of third-party reports of domestic violence, failed to indicate a criminal history of assault in LEADS, and failed to indicate that there was a 2013 order of protection taken against Joann by her mother. Ruzicka stated that defendant would have known these things if he had secured the prior police reports and "looked back through the record."

¶ 44    Ruzicka also discussed the Child Endangerment Risk Assessment Protocol (CERAP). This form assesses the potential for harm to the child immediately or in the near future. Ruzicka testified

that if defendant had properly completed the form, it would have indicated that there had been a person violent or out of control that had harmed the child and that the caregiver had failed to protect the child's safety. Ruzicka noted that defendant did not investigate who frequented the home; how Joann, Nowicki, or Drew acted toward A.J. or P.F.; or whether any of those three had "dangerously unrealistic expectations" for A.J. or P.F. The CERAP should also have indicated that "alleged or observed substance abuse" seriously affected the ability to protect or care for the children because there was "clearly evidence of substance abuse" and nobody was drug tested. Moreover, based on Joann's LEADS report (which showed she had two prior charges for assault and a 2013 domestic battery case), the CERAP should have indicated the presence of violence affected a caregiver's ability to provide care or protect a child from moderate to severe harm.

¶ 45    Ruzicka criticized defendant for not getting a second opinion on the cause of A.J.'s bruise, which was required by the P300s, since Channon could not offer an opinion as to the cause of the injury. In her opinion, Ruzicka did not believe that A.J. got his bruise from a dog putting its paw on him.

¶ 46                              5. Dr. Raymond Davis

¶ 47    Dr. Davis is a pediatrician who runs a child abuse protection program affiliated with the University of Illinois College of Medicine called MERIT, which works with Child Advocacy Centers in northern Illinois (including the CAC in McHenry County). He is an expert in child abuse and was familiar with defendant, who had referred child abuse cases to MERIT in the past. MERIT conducts in-person physical examinations of suspected child abuse victims and performs "chart consults" with DCFS or law enforcement or physicians, to look at photographs and medical records to help determine "causation or concern for abuse." If they observe injuries on a child that are visible in photographs, "our policy is to see those patients, if requested, as soon as possible."

Davis testified that he never received photographs from defendant or defendant's supervisor in this case.

¶ 48    In court, Davis reviewed the photographs taken of A.J. on December 18, 2018, noting multiple facial bruises and abrasions, in addition to the torso bruising, which he described as running around the side to his back along soft tissue areas, presenting "a lot of different [planes] of injury." He stated that he would need context to determine causation of injuries and that it is common for a child abuse victim to be reluctant to disclose abuse by a family member. He stated that the injuries depicted in the photographs were "less likely to be a dog," unless "the dog knock[ed] him down a flight of stairs." The injuries were not consistent with a dog "putting a paw on a child." Davis testified that the bruising on A.J.'s torso "could be" consistent with a belt.

¶ 49                                6. Shannon Krueger

¶ 50    Shannon Krueger, a pediatric nurse practitioner and director at MERIT, also testified as a child abuse expert, having examined thousands of suspected child abuse victims. She testified that MERIT would have accepted this case for a "same day or next day" physical examination. She explained that "we aren't forensic interviewers, we leave that to the Child Advocacy Centers. We are doing the medical portion." As part of the medical examination, however, they would need information about the type of contact alleged, whether the child had been previously examined, any medical records and photos, and "any previous concerns." MERIT can form a medical opinion based on photos "with as much history as we can obtain." Physical examinations are comprehensive and photo documented.

¶ 51    Krueger knew defendant, who had referred cases to MERIT before; she confirmed that MERIT had not been referred A.J.'s case. After reviewing the photos of A.J., Krueger testified that the bruising on A.J.'s torso was concerning for abuse due to the "linear pattern and fashion," adding

that "the location, the size, and the grouping of the injuries are all more than what one would expect in an accidental injury." Krueger testified, "In my experience, I've never seen a dog injury that would look similar to this."

¶ 52                                    7. Pamela Wells

¶ 53    Pamela Wells, a former Winnebago County Assistant State's Attorney, testified as an expert in juvenile abuse and neglect cases. She testified that if the state's attorney's office had been contacted regarding the December 18, 2018, incident, the State would have obtained a temporary custody hearing, which would have resulted in temporary custody being taken of A.J., pending the completion of the investigation and adjudicatory hearing. Wells further testified that based on an investigation, either the trial court would not have returned A.J to his home or it would have returned A.J. with conditions. Those conditions would have required regular interactions with child welfare workers. Under either scenario, Wells believed that A.J. would not have been murdered on April 15, 2019.

¶ 54                                    8. Julia Almeida

¶ 55    Julie Almeida testified that she was the prosecutor for juvenile abuse and neglect cases in McHenry County during the relevant time. She "absolutely" would have filed a petition if defendant had maintained protective custody on December 18, 2018, and if she had been provided with the information that was in the police report from December 18, 2018. She remembered A.J.'s prior juvenile abuse and neglect case (which she prosecuted) because of the length of time that case was pending and the personalities involved. She would have filed a petition based on not only "[t]he existence of heroin in a parental relationship in and of itself" but because there was also "a constellation of other issues," which included bruises, relapses, the father not present or aware, a detachment at birth, and ongoing problems throughout the duration of the past case.

¶ 56                          9. Misty Marinier

¶ 57    Misty Mariner, executive director of the CAC in McHenry County, testified that there was an agreement between the CAC and various other agencies in McHenry County, including DCFS. The agreement applied to "[a]ny injury," but specifically referred to "severe physical abuse," which included bruises. Upon disclosure of this type of abuse, DCFS was required to notify the CAC, law enforcement, and the state's attorney's office. The CAC was not contacted regarding the December 18, 2018, incident. If the CAC had been notified, it would have scheduled an interview for A.J. On cross-examination, Mariner acknowledged that the CAC protocol noted that severe physical abuse would "usually include a significant injury that requires emergency room treatment or hospitalization."

¶ 58                          10. Dr. Demetra Soter

¶ 59    Dr. Demetra Soter, a forensic pediatrician who trained DCFS workers on diagnosing child abuse, reviewed the sequence reports, police reports, medical records, photographs of the bruise on A.J.'s torso, the video exhibits, and the autopsy report for A.J. She testified that A.J.'s bruise was not consistent with being from a dog or a football. She observed that the house looked "unhealthy" and reflected "the inability to parent and clean a house." She said that some of the things that could have been done included a safety plan, intact family services, drug and domestic violence treatment, random drug testing, and taking temporary custody. Additionally, protective custody should not have been allowed to lapse given what A.J. told Channon. A.J. should have been seen by a child abuse doctor and should have had a forensic interview. She believed that A.J. "would not have been tortured to death" if any of these interventions had occurred.

¶ 60                              11. Lisa Matsen

¶ 61     Lisa Matsen, Joann's cousin, testified that she fostered A.J. from when he was 4 weeks old to 18 months old. She then had to return him to Joann and Drew. She stayed in contact with A.J. for about two years until Joann said Matsen was not a good influence and prohibited contact. She was not contacted by DCFS regarding the current incident until April 2019 when she was asked to foster A.J.'s younger brother, P.F.

¶ 62                          B. Trial Court's Findings

¶ 63     At the close of the State's case, the trial court denied defendant's motion for directed finding. Defendant introduced two exhibits into evidence: a transcript of the forensic pathologist who conducted A.J.'s autopsy and Appendix G to the P300s, concerning CERAPs. The defense rested without calling witnesses.[5]

¶ 64     After hearing closing arguments, the trial court found defendant guilty of both counts of child endangerment and dismissed the reckless conduct charge. The trial court stated that DCFS's "ultimate goal of protecting children" was effectuated through 500 pages of rules, which were "clearly highly relevant to a road map of this case." The trial court noted that defendant's investigation was a C-sequence, showing that the family had prior DCFS cases. The trial court found that the nature of the A-sequence was available and known to defendant, including the fact that A.J. was born with opiates in his system while Joann denied the use of opiates and that A.J. was separated from Joann for 18 months before returning home. The B-sequence described Joann as being in the hospital after being passed out behind the wheel of a car and having "track marks up and down her arms," meaning she probably relapsed on heroin. At the hospital, A.J. had unexplained injuries, the children were wearing filthy and inside-out clothing, and they appeared

_____

[5]Co-defendant Polovin presented no evidence.

uncomfortable around their father. The B-sequence described Joann as being involved in domestic violence, having a psychological diagnosis, and being suicidal on at least two occasions.

¶ 65    As to the C-sequence report, the trial court found that calling the injury a bruise does not do "justice to what this injury is." The trial court found it "ridiculous" to believe that the injury was caused by a dog or a football. Rather, the injury was consistent with being whipped by a belt.

¶ 66    In discussing defendant's report, the trial court noted that defendant relinquished protective custody that morning at the police station (1) prior to A.J. being medically examined and (2) without interviewing Joann as to how the injury happened and investigating her statement that it was the dog. The trial court found it perplexing why defendant sent A.J. to the emergency room to be examined for a bruise. The trial court noted that Channon spoke with A.J. there and A.J. made "nothing less *** than a direct accusation against his mother that she hit him with a belt." Despite Channon's insistence that defendant needed to bring A.J. somewhere where his accusations could be investigated, defendant did not send him anywhere else. The trial court noted that multiple risk factors for abuse were present: (1) changing explanations for injuries, (2) unwitnessed injury, (3) bruises on non-prominent areas, and (4) multiple injuries.

¶ 67    The trial court faulted defendant's drug screen of Joann, as many of the answers to his questions were "obvious lies" that minimized Joann's history of substance abuse and treatment. The trial court also criticized defendant's interview of A.J. The trial court noted that it was just three sentences, with A.J. stating that he and his brother, P.F., were watching a movie on the couch with their dog and the dog "put her paw" on him. Although P.F. would have been an eyewitness to whatever happened, defendant refused to use the CAC as a resource that could interview P.F. The trial court also noted there was inexplicably no attempt to speak with Nowicki. The trial court

found that defendant's conversation with Drew was so brief that it amounted to a refusal to investigate.

¶ 68     The trial court noted that defendant spoke to the caseworker about the B-sequence. While that sequence involved Joann, with "track marks" on her arms, being passed out behind the wheel of a car, a child with unexplained injuries, and the children dirty and afraid, defendant summarized it only as the mother being found asleep in the car while the children were safe at home with the father and the mother entering treatment. The trial court found that the report by defendant about the B-sequence was "actively dishonest and misleading."

¶ 69     The trial court discussed the safety assessment at the end of defendant's report, which it considered to be "pure fiction." The safety decision section dishonestly omitted any mention of A.J. accusing Joann of inflicting the injuries with a belt. The trial court specifically found that defendant's indication in his report that no one in the home had been violent or out of control was "a lie." Other "highly concerning" aspects of the case were also not mentioned there, including chaos in the home, the filthy state of the home, and a history of mental illness and drug addiction.

¶ 70     The trial court observed that there were many resources available to DCFS, but defendant ignored most of them. The trial court stated that A.J. should have been taken to MERIT and interviewed at the CAC in a child-friendly environment. Defendant also could have used the resources of the McHenry County State's Attorney's Office or the Crystal Lake Police Department. The trial court found that defendant should have met with the state's attorney's office, which would have had questions defendant could not answer about what he had done.

¶ 71     The trial court discussed "dishonesty," which it defined as "if *** you omit a statement within context that is important and you know it is or should know it is, that is dishonest." The trial court found defendant was "not a reliable reporter of what he [was] doing." The trial court

- 19 -

expounded that defendant "ma[de] material omissions *** on purpose where he could put [an] innocuous or benign reason for something happening he did and omitted *** the very obvious facts of the case."

¶ 72    The trial court further found that defendant's actions were the proximate cause of A.J.'s death. The trial court stated that "this case would have been referred [for court intervention] without any question *** [and] if there was a hearing, [the court could not] imagine any judge would not have taken this child out of the house." The trial court found that "at a minimum, there would have been a guardian *ad litem*" (GAL) appointed. The trial court explained that defendant "thrust" A.J. back into "an inherently dangerous situation."

¶ 73                              C. Posttrial Motions

¶ 74    Defendant filed a posttrial motion, which was heard and denied at the time of the sentencing hearing. In its denial of the motion, the trial court explained its prior factual findings and added, "yes, it was foreseeable." The trial court cited "obvious injuries," A.J.'s statement about those injuries, a "clearly unstable mother and the use of heroin in the house," Joann's history of violence, her "acting out" and "disregarding rules," the "ramshackle" condition of the home, and the lack of appropriate clothing for the children. The trial court merged the child endangerment counts and sentenced defendant to 6 months in the county jail and 30 months of probation. Defendant thereafter filed a timely notice of appeal.

¶ 75                              II. ANALYSIS

¶ 76    On appeal, defendant argues that he was not convicted beyond a reasonable doubt of endangering the life or health of a child. Specifically, he argues that the State failed to prove (1) that he knowingly caused or permitted A.J.'s life or health to be endangered (or placed A.J. in endangering circumstances) when he returned A.J. to Joann and closed the case without taking any

protective action, and/or (2) that his actions were a proximate cause of A.J.'s death months later. This is a case of first impression as to the criminal liability of a child protective investigator for endangerment of a child who is the subject of a report of abuse or neglect.

¶ 77                                    A. Duty

¶ 78    A material element of every offense is a voluntary act, although this "includes an omission to perform a duty which the law imposes on the offender and which he is physically capable of performing." 720 ILCS 5/4-1 (West 2018). The word "act" is used broadly and includes "a failure or omission to take action." (Internal quotation marks omitted.) *People v. Kotlinski*, 2011 IL App (2d) 101251, ¶ 47 (citing *People v. Synnott*, 349 Ill. App. 3d 223, 227 (2004)); Black's Law Dictionary 292 (7th ed. 1999) (defining "conduct" as "[p]ersonal behavior, whether by action or inaction"); see also *People v. Stroud*, 2023 IL App (2d) 220306, ¶ 31 (evidence supported finding that, by failing to take 11-year-old son, a heart transplant recipient, to necessary medical appointments and failing to administer essential medications, mother knowingly caused or permitted child's health to be endangered).

¶ 79    We note that, "[g]enerally, a person will not face criminal liability for failing to aid another." *People v. Peters*, 224 Ill. App. 3d 180, 190 (1991). However, where there is a special relationship, as between a parent (or person standing *in loco parentis*) and a child in their care, such persons have an affirmative duty to act to protect that child. 1 Wayne R. LaFave, Substantive Criminal Law § 6.2(a)(1) (3rd ed. 2017). For decades, the "trend of Anglo-American law has been toward enlarging the scope of criminal liability for failure to act in those situations in which the common law or statutes impose a responsibility for the safety and well-being of others." *State v. Walden*, 293 S.E.2d 780, 785 (N.C. 1982) (finding a mother criminally liable for aiding and

- 21 -

abetting assault for being present and watching an hours-long beating of her "small child" by the child's father and failing to deter, prevent or stop the assault).

¶ 80    Among the dangers that such persons have a duty to protect children from are those posed by other people. See, *e.g.*, *id.*; *Peters*, 224 Ill. App. 3d at 190 (mother had duty to remove child from abusive boyfriend: "A person who knows that his or her child is in a dangerous situation and fails to take action to protect the child, presumably intends the consequences of the inaction."); see also *Fisher v. State*, 220 S.W.3d 599, 601 (Tex. Ct. App. 2007) (custodial father had duty to act to protect child from his abusive new wife); *State v. Buhr*, 169 S.W.3d 170, 177 (Mo. Ct. App. 2005) (affirming conviction of mother for child endangerment where her leaving 3-year-old son with abusive boyfriend was "practically certain to cause substantial risk to [son]'s life, body, or health"); *Barrett v. Commonwealth*, 597 S.E.2d 104, 111 (Va. 2004) (affirming guilty verdict for felony neglect against mother who left 10-month-old child with abusive older sibling); *State v. Watkins*, 659 S.W.2d 526, 536-37 (Iowa 2003) (upholding child endangerment conviction of mother for failing to protect 2-year-old daughter from abusive boyfriend); *Payton v. State*, 106 S.W.3d 326, 331-32 (Tex. Ct. App. 2003) (custodial grandfather "omitted" act of protecting 18-month-old from abusive biological father); *P.S. v. State*, 565 So. 2d 1209, 1210, 1212 (Ala. Crim. App. 1990) (juvenile mother had duty to protect child "from physical assault by a third party," her live-in boyfriend); *State v. Williquette*, 385 N.W.2d 145, 155 (Wis. 1986) (upholding mother's conviction of child abuse under statute that "prohibits persons from exposing or subjecting a child to a foreseeable risk of cruel maltreatment" for leaving children with husband whom she knew to be physically and sexually abusing them); *Pope v. State*, 396 A.2d 1054 (Md. 1979) (mother's friend who undertook custody and care of 3-month-old for two days was guilty of child abuse for failing to stop physical abuse by mother and then failing to obtain medical care, leading to child's death);

*Commonwealth v. Howard*, 402 A.2d 674, 676 (Pa. Super. Ct. 1979) (holding that "[a] parent has the legal duty to protect her child, and the discharge of this duty requires affirmative performance," in finding mother guilty of involuntary manslaughter for failing to protect her 5-year-old from abuse by boyfriend); *Bowers v. State*, 389 A.2d 341, 350 (Md. 1978) (mother failed to stop beating of child by paramour, who was himself found to be *in loco parentis*); *Palmer v. State*, 164 A.2d 467, 352-53 (Md. 1960) (gross criminal negligence sustained against mother for failure to stop beatings, causing death of 20-month-old, by mother's paramour when she could "easily" have removed the child).

¶ 81    Even persons unrelated to a child may have a common law duty to protect the child. See, *e.g.*, *People v. Berg*, 171 Ill. App. 3d 316, 320 (1988); *Commonwealth v. Spanier*, 192 A.3d 141, 152-53 (Pa. Super. Ct. 2018) (university president had duty to act in response to reports of sexual abuse of children by football coach); *Commonwealth v. Lynn*, 114 A.3d 796, 586-87 (Pa. 2015) (affirming conviction for endangering the welfare of a child of high-ranking church official who placed a priest with known history of sexually abusing children into an environment where there was a significant risk he would reoffend, finding defendant owed a duty not to endanger children's welfare).

¶ 82    Unrelated persons may also be required by statute to protect a child. 1 Wayne R. LaFave, Substantive Criminal Law § 6.2(a)(2) (3d ed. 2017); see also *State v. Kanavy*, 4 A.3d 991, 995 (Md. 2010) (finding that employees of state Department of Juvenile Services working at a school/detention facility had "a legal duty to comply with the applicable laws," including providing a safe, humane environment to juvenile inmates, sufficient to sustain convictions for reckless endangerment for failing to call 911: "the laws of Maryland imposed a duty to provide the deceased with appropriate medical care"). But see *Bom v. Superior Court of Los Angeles County*,

257 Cal. Rptr. 3d 276, 285-86 (Ct. App. 2020) (holding that DCFS worker was not culpable for returning child to parents who later murdered him, interpreting statute imposing criminal liability on those who, "under circumstances or conditions likely to produce great bodily harm or death, willfully cause[ ] or permit[ ] any child to suffer" as requiring that a duty is imposed "based not on the relationship between the defendant and the [abused], but rather, on that between the defendant and the abuser," and finding that DCFS worker's ability to take child into protective custody was only discretionary (internal quotation marks omitted)).

¶ 83     DCFS and its employees are charged by the legislature under the Abused and Neglected Child Reporting Act (Act) with protecting "the health, safety, and best interests of the child [who is the subject of a report] in all situations in which the child is vulnerable to child abuse or neglect, [and with offering] protective services in order to prevent any further harm to the child." 325 ILCS 5/2(a) (West 2018); see *In re C.J.*, 166 Ill. 2d 264, 269-70 (1995) (describing DCFS as "a legislatively created agency charged with the duty to protect and promote the welfare of the children of Illinois"). The purposes of the Act are "to protect children from neglect and abuse" and "to protect subjects [of reports of suspected child abuse or neglect] from the detrimental effect of inaccurate reports." *Shawgo v. Department of Children & Family Services*, 182 Ill. App. 3d 485, 490 (1989). DCFS is "the sole agency responsible for receiving and investigating reports of child abuse or neglect made under [the] Act." 325 ILCS 5/7.3(a) (West 2018).

¶ 84     The Act requires DCFS to establish Child Protective Service Units (CPS Units) by geographic region, which are required to be adequately staffed and "organized in such a way as to maximize the continuity of responsibility, care and service of the individual workers toward the individual children and families." *Id.* § 7.2. CPS Unit staff (or "child protection staff") are defined

by rule[6] as "certain specialized State employees of the Department assigned by the Director or his or her designee to perform the duties and responsibilities described under [the Act]." (Emphases omitted.) 89 Ill. Adm. Code 300.20 (2018). Child protection staff include "[l]ocal investigative staff," charged with investigating reports of suspected child abuse or neglect. 89 Ill. Adm. Code 300.50(b) (1987). In coordination with a supervisor, a child protection investigator must determine such things as whether to impose temporary protective custody (325 ILCS 5/5 (West 2018)) and whether a case should be "indicated" or "unfounded" based on whether there is "credible evidence" of abuse or neglect. *Id.* § 3, 7.14, 8.1.

¶ 85    Under the Act, once DCFS receives a report, its employees must

"protect the health, safety, and best interests of the child in all situations in which the child is vulnerable to child abuse or neglect, offer protective services in order to prevent any further harm to the child and to other children in the same environment or family, stabilize the home environment, and preserve family life whenever possible." *Id.* § 2(a).

Upon receiving a report, DCFS staff must within 24 hours (or immediately if "it appears that the immediate safety or well-being of a child is endangered") conduct an initial investigation to determine whether there is reasonable cause to believe child abuse or neglect exists. *Id.* § 7.4(b)(2); 89 Ill. Adm. Code 300.100(a) (1990). The initial investigation must include "in-person contact with all alleged child victims," as well as data checks of all DCFS and law enforcement records and contact with the reporter. 89 Ill. Adm. Code 300.100(b)(1). Investigative staff must examine

[6]Rule refers to the statutory meaning. 20 ILCS 505/4 (West 2018) (authorizing DCFS "[t]o make all rules necessary for the execution of its powers"); see *Wright v. Department of Children & Family Services*, 2025 IL App (4th) 240049, ¶ 78 ("When an agency adopts rules pursuant to the statutory authority, they have the force of law and bind the agency to them ***.")

certain criteria to determine whether there is a good faith indication to believe that abuse or neglect exists, including whether the child has been harmed or is in substantial risk of harm and whether an "abusive or neglectful incident or set of circumstances" caused the alleged harm or substantial risk of harm. *Id.* § 300.100(g). If these criteria are present, then "a formal investigation shall commence," which must begin as soon as this determination is made. 325 ILCS 5/7.4(b)(3) (West 2018); see 89 Ill. Adm. Code 300.100(h) (1990); 89 Ill. Adm. Code 300.110(a) (1998).

¶ 86    The Act requires that the formal investigation include six components: (1) direct contact with the subjects of the report as soon as possible; (2) an evaluation of the environment of the child; (3) a determination of the risk to such child of remaining in that environment; (4) a determination of the nature, extent and cause of any condition reported; (5) the name, age and condition of other children in the environment; and (6) an evaluation as to "whether there would be an immediate and urgent necessity to remove the child from the environment if appropriate family preservation services were provided." 325 ILCS 5/7.4(b)(3) (West 2018). Within 7 days, the investigator must have "direct, in-person contact with the alleged child victim" and the alleged perpetrator. 89 Ill. Adm. Code 300.110(c) (1998). A formal investigation must conclude with a determination of "indicated" or "unfounded" within 60 days, but "where it is not possible to initiate or complete an investigation within 60 days the report may be deemed 'undetermined' provided every effort [was] made to undertake a complete investigation," and the deadline may be extended for "additional periods of up to 30 days each for good cause shown." 325 ILCS 5/7.12 (West 2018). At the conclusion of the formal investigation, DCFS must determine whether the initial report was "an indicated report," meaning that "credible evidence of the alleged abuse or neglect exists," or "an unfounded report," meaning that "no credible evidence of abuse or neglect exists." *Id.* § 3. Investigative staff may add allegations during their investigation but shall make a final

- 26 -

determination as to whether a child was abused or neglected "based upon whether the information gathered from other persons during the investigation and the direct observations made by the investigative staff during the investigation constitute credible evidence of child abuse or neglect." 89 Ill. Adm. Code 300.110(i) (1998). "When credible evidence of abuse or neglect has been obtained pertinent to an allegation, the allegation is indicated" (*id.* § 300.110(i)(3)), and "[i]f any allegation of child abuse or neglect is indicated, the report is indicated." *Id.* § 300.110(i)(3)(A)(i). " '[C]redible evidence of child abuse or neglect' means that the available facts, when viewed in light of surrounding circumstances, would cause a reasonable person to believe that a child was abused or neglected." 89 Ill. Adm. Code 300.20 (2018).

¶ 87    To fulfill their statutory requirements, DCFS investigative staff "shall have the capability of providing or arranging for comprehensive emergency services to children and families at all times of the day or night." 325 ILCS 5/7.4(b)(3) (West 2018). The Act also dictates the process for taking temporary protective custody of a child:

> "An officer of a local law enforcement agency, designated employee of [DCFS], or a physician treating a child may take or retain temporary protective custody of the child without the consent of the person responsible for the child's welfare, if (1) he has reason to believe that the child cannot be cared for at home or in the custody of the person responsible for the child's welfare without endangering the child's health or safety; and (2) there is not time to apply for a court order under the Juvenile Court Act of 1987 for temporary custody of the child." *Id.* § 5.[7]

---

[7]The Act also provides immunity for taking or retaining temporary custody: "Any person authorized and acting in good faith in the removal of a child under this Section shall have immunity from any liability,

DCFS rules clarify that temporary protective custody is appropriate if there is reason to believe that "leaving the child in the home or in the care and custody of the child's caregiver presents an imminent danger to the child's life or health." 89 Ill. Adm. Code 300.120(a)(1) (2015). When

> "receiving a child who was taken into temporary protective custody by the local law enforcement officer or by a physician, Department child protection staff shall:
>
> * * *
>
> [make certain notifications, request necessary medical treatment, and] obtain a shelter care hearing under the provisions of the Juvenile Court Act within 48 hours, excluding Saturdays, Sundays, and holidays, in order to retain custody for more than 48 hours." *Id.* § 300.120(d).

¶ 88 Based on the foregoing, it is clear defendant had a duty to protect A.J.'s health and safety. Defendant was an experienced child protective investigator, with specialized training in several areas: recognizing child abuse and neglect, reporting and child protection processes, and various particularized investigative duties under the Act and DCFS rules. Once assigned to investigate the report of child abuse and neglect of A.J., defendant had a statutory duty to not only comply with the Act and DCFS rules, but also to protect A.J. to the extent he was authorized by law and thus to avoid endangering A.J. or placing him "in circumstances that endanger[ed his] life or health." See 720 ILCS 5/12C-5(a) (West 2018). To effectuate that responsibility, the State gave defendant the ability to take protective custody of A.J., to impose conditions on Joann, and to take other measures, meaning defendant was "physically capable" of performing his duty. See *id.* § 4-1.

---

civil or criminal that might otherwise be incurred or imposed as a result of such removal." 325 ILCS 5/5 (West 2018).

¶ 89                    B. Endangering the Life or Health of a Child

¶ 90    Having found that defendant bore a duty toward A.J., we turn to whether defendant's failure to exercise his power to remove A.J. from Joann's custody and his decision to close the investigation as "unfounded" and return A.J. to his mother's custody without conditions or other protective action can support a conviction of child endangerment. It is the State's burden to prove every element of the offense beyond a reasonable doubt. *People v. Siguenza-Brito*, 235 Ill. 2d 213, 224 (2009). When reviewing the sufficiency of the evidence, we must ask if, after reviewing the evidence in the light most favorable to the prosecution, any rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt. *People v. Belknap*, 2014 IL 117094, ¶ 67. The trier of fact is responsible for determining the credibility of the witnesses and the weight to be given to their testimony and has the responsibility "to resolve conflicts in the evidence, and to draw reasonable inferences from that evidence." *People v. Johnson*, 392 Ill. App. 3d 127, 130 (2009) (citing *People v. Jackson*, 232 Ill. 2d 246, 281 (2009)). All reasonable inferences from the evidence must be allowed in favor of the State. *People v. Gonzalez*, 239 Ill. 2d 471, 478 (2011). We will not substitute our judgment for that of the trier of fact in assessing witness credibility or assigning weight to the evidence. *People v. Gaines*, 2020 IL App (2d) 180217, ¶ 56. A criminal conviction will not be overturned unless the evidence is so improbable, unreasonable, or unsatisfactory as to create a reasonable doubt of the defendant's guilt. *People v. Rowell*, 229 Ill. 2d 82, 98 (2008).

¶ 91                                    1. *Mens Rea*

¶ 92    "A person commits endangering the life or health of a child when he or she knowingly: (1) causes or permits the life or health of a child under the age of 18 to be endangered; or (2) causes or permits a child to be placed in circumstances that endanger the child's life or health." 720 ILCS

5/12C-5(a) (West 2018). Our supreme court has interpreted the term "endanger" as meaning " 'to bring into danger or peril of probable harm or loss' or 'to create a dangerous situation.' " *People v. Collins*, 214 Ill. 2d 206, 214-15 (2005) (quoting Webster's Third New International Dictionary 748 (1986)); see *People v. Wilkenson*, 262 Ill. App. 3d 869, 874 (1994). " '[B]y its plain meaning, the term ["endanger"] refers to a potential or possibility of injury.' " *People v. Jordan*, 218 Ill. 2d 255, 270 (2006) (quoting *Collins*, 214 Ill. 2d at 215). The term does not refer to conduct that "will result or actually results in harm, but rather to conduct that could or might result in harm." (Internal quotation marks omitted.) *Id.* Thus, endangering "refers to a potential or possibility of injury." *Collins*, 214 Ill. 2d at 215.[8]

¶ 93     When an "offense is defined in terms of a prohibited result," the knowledge element is defined as being "consciously aware that that result is practically certain to be caused by his conduct." Illinois Pattern Jury Instructions, Criminal, No. 5.01B, Committee Note (approved Oct. 28, 2016); 720 ILCS 5/4-5(b) (West 2018). " 'Knowledge,' for purposes of criminal liability, probes into what the accused was 'subjectively, consciously aware of.' " *Kotlinski*, 2011 IL App (2d) 101251, ¶ 54 (quoting 1 John F. Decker, Illinois Criminal Law § 2.34, at 2-69 (2d ed. 1993)); see *People v. Hall*, 273 Ill. App. 3d 838, 842 (1995) (holding that the defendant in aggravated battery of a child prosecution, by holding up an infant to shield himself from gunshots, had

---

[8]In an unpublished Illinois Supreme Court Rule 23 (eff. Jan. 1, 2021) order, the Fourth District interpreted the supreme court's use of "potential or possibility" as meaning "a *probability* of injury: a possibility that is great enough that society deems the running of the risk to be irresponsible." (Emphasis added.) *People v. Myers*, 2022 IL App (4th) 200592-U, ¶ 48 (citing *Collins* and contrasting the *mens rea* for murder with that for endangering the life or health of a child, describing it as requiring "the defendant's knowledge of an irresponsibly high likelihood, not merely a possibility, of the child's coming to harm").

"knowledge that great bodily harm [to the infant] was practically certain to follow"). However, the term "practically certain" does not mean that the State must prove a "defendant was absolutely certain" that his conduct would cause a result. *Hall*, 273 Ill. App. 3d at 842.

¶ 94    Knowledge, by its very nature, is ordinarily proven through circumstantial evidence, rather than direct proof. *In re Keith C.*, 378 Ill. App. 3d 252, 260 (2007). The State must present sufficient evidence from which an inference of knowledge can be made. *Id.* A defendant need not admit knowledge for the trier of fact to conclude that he acted knowingly. *People v. Rader*, 272 Ill. App. 3d 796, 806 (1995). Any inference must be based on established facts. *Kotlinski*, 2011 IL App (2d) 101251, ¶ 55.

¶ 95    Here, there is ample circumstantial evidence that defendant was subjectively, consciously aware that returning A.J. to Joann without conditions, services, or other action would endanger A.J.'s life or health. The strongest evidence in support of defendant's knowledge that he was placing A.J.'s well-being at risk was his own report. It is undisputed (and indisputable) that defendant knew the facts he wrote in his report. However, the trier of fact was not limited to considering defendant's report as if it was the only evidence of his knowledge. Importantly, there were additional facts the trial court found were actually known to defendant but not included in his report or other communications to his supervisor.

¶ 96    Intent may be inferred not only from a defendant's act, but also his "conduct surrounding the act." *People v. Soto*, 2023 IL App (3d) 220029-U, ¶ 19. As telling as the report's written facts are as to defendant's state of mind, another strong indicator of what defendant knew at the time was what he decided to omit or even lie about. The trial court described the C-sequence report as being "actively dishonest and misleading." It characterized the report as purposely containing

- 31 -

material omissions and found that defendant "lied" about the lack of violence in the home. The trial court further found that defendant's safety assessment in his report was "pure fiction."

¶ 97   Our supreme court has repeatedly recognized that false statements reflect a consciousness of guilt. See *People v. Drake*, 2019 IL 123734, ¶ 26; *People v. Harris*, 225 Ill. 2d 1, 26-27 (2007) (use of false identification may be admitted as evidence of consciousness of guilt); *People v. Milka*, 211 Ill. 2d 150, 181 (2004) (a false exculpatory statement is probative of consciousness of guilt). Thus, defendant's numerous false statements suggesting A.J. was not at risk demonstrate that defendant actually knew that he was risking A.J.'s safety by not placing him in protective care.

¶ 98   This conclusion is consistent with the evidence presented at trial. Defendant was obviously aware that this was a C-sequence investigation, meaning it was the third time DCFS had been involved with A.J. and his family because of reports of abuse or neglect, along with an extensive history of illegal drug use by Joann. The first time involved A.J. being born with drugs in his system because Joann had used opiates and other drugs while pregnant. The period of supervision for that case lasted two and a half years. In the second case, the B-sequence, police discovered Joann, with track marks on her arms, passed out in a car. That created a reasonable inference that she had been using drugs again. That case also involved A.J. having unexplained injuries. Although the B-sequence investigation was closed as "unfounded," that result was due to the boys not being in Joann's presence at the time she was found unconscious, combined with her enrollment in "detox and treatment."

¶ 99   As to defendant's C-sequence investigation, defendant talked with Shipbaugh. She told him about Joann appearing as if she was strung out on heroin, the disgusting and unsafe conditions at Joann's house, and A.J.'s horrific bruising and her insistence that the injury was not caused by a dog. Defendant also talked with Channon about her examination of A.J., her belief that Joann was

A.J.'s abuser, and her belief that A.J should not be allowed to leave the hospital with Joann. Channon told defendant that A.J. needed to be examined by a forensic specialist and talk with a forensic interviewer. Most telling, defendant omitted A.J.'s statements indicating he had been hit by a belt, which "made the mark," and "maybe Mommy didn't mean to hurt me." Instead, defendant emphasized Channon's statement that it "could have been a dog or a belt or a football," without adding, for context, her disclaimer that she was not a forensic or child abuse specialist. Moreover, defendant refused Channon's pleas that he have A.J. examined by more competent professionals, which he also omitted from his report and text communication with his supervisor. This evidence thus indicates that defendant knew his actions were leaving A.J. in "danger or peril of probable harm." (Internal quotation marks omitted.) *Collins*, 214 Ill. 2d at 214. Even where a defendant presents a merely " '[l]imited' version of what had happened," a rational trier of fact may determine that this shows his consciousness of guilt. *People v. Trajano*, 2018 IL App (2d) 160322, ¶ 28. As the trial court found, when defendant closed the case as unfounded, his conclusion that he had obtained no credible evidence of abuse or neglect during his investigation was not only unreasonable but reflected his desire to swiftly close the case in spite of obvious risk of harm to A.J. See 325 ILCS 5/7.12 (West 2018); 89 Ill. Adm. Code 300.20 (2018).

¶ 100    This determination is consistent with our supreme court's decision in *Jordan*, 218 Ill. 2d at 270. There, the defendant was convicted of knowingly endangering his infant child's life or health by leaving the child unattended in his vehicle for 40 minutes while the outside air temperature was in the twenties. *Id.* at 270-71. On appeal, the supreme court found that there was sufficient evidence to support a finding of guilt. *Id.* at 274. In so ruling, the court considered such factors as "the setting where the vehicle was parked, the weather conditions, and the amount of time defendant

left his daughter alone in the vehicle." *Id.* at 270. The court found that a risk of harm existed even aside from the cold, explaining:

"Weather conditions aside, it is an unfortunate fact of modern urban life that the more populated the area, the greater the likelihood that some ill will befall a young child who is left unattended in a public place. A young child unattended in a public setting is easy prey for social predators who may happen by. Legal reporters in our law libraries are rife with tragic examples confirming this observation. The danger is no less real because the actual occurrence of such an incident is a random event." *Id.* at 271.

The court then expounded that it was a "matter of 'common sense'" that "leaving a child unattended in a public place exposes the child to the danger posed by those in our society who may harm the child." *Id.*

¶ 101   The risk in this case was not from a random event or mere generalized risk of encountering a potential bad actor. A.J. was placed in direct danger when he was returned to his abusive mother without any safeguards. As such, the trial court could reasonably conclude that defendant had knowingly endangered A.J.'s life or health.

¶ 102   Defendant argues that he was merely negligent for failing to secure certain information and an order of protection during his investigation. He insists, however, that his negligence does not prove he knowingly endangered A.J.'s life. He argues that the information he was aware of was inconclusive as to how A.J. suffered the bruise; that it was possible that A.J. could have been injured by a dog, a football, or a belt; and that A.J.'s own statement suggested that his bruising may have been accidental and therefore defendant could not be "practically certain" that returning A.J. to Joann would result in harm. However, simply because there may be other possible explanations for A.J.'s injuries does not mean that the trier of fact was required to credit them.

"Where evidence is presented and such evidence is capable of producing conflicting inferences, it is best left to the trier of fact for proper resolution." *People v. McDonald*, 168 Ill. 2d 420, 447 (1995). The trier of fact, in weighing the evidence, "is not required to disregard inferences that flow from the evidence, nor is it required to search out all possible explanations consistent with innocence and raise them to a level of reasonable doubt." *Id.*

¶ 103    Defendant further argues that, based on the "dearth of information" that he had, he could not have known the danger that A.J. would encounter. Rather, he maintains that, based on the limited information he did have, he made a "judgment call" as to whether an order of protection should be entered for A.J.'s benefit. The fact that he made the wrong call does not constitute a criminal offense.

¶ 104    There are four problems with this argument. First, defendant essentially asks us to construe all the evidence and inferences in his favor. As stated earlier, on appeal, following a conviction, we review the evidence in the light most favorable to the State—not to the defendant. *Gonzalez*, 239 Ill. 2d at 478. The second problem with defendant's assertion that his lack of compliance with his investigative and protective responsibilities should absolve him of the requisite knowledge of harm is that he lied about the extent of that knowledge, as discussed *supra* ¶¶ 96-99. Third, the trial court specifically rejected the argument that he was merely negligent. In discussing defendant's investigation, the trial court repeatedly found that defendant had obtained plenty of credible evidence of abuse and neglect, then refused to investigate further or comply with DCFS rules and procedures, not just that his investigation was inattentive or neglectful. Black's Law Dictionary explains the difference between these two concepts:

> " '[N]eglect' signifies a mere omission of a duty, which may happen through inattention, dilatoriness, mistake, or inability to perform, while 'refusal' implies the positive denial of

an application or command, or at least a mental determination not to comply." Black's Law Dictionary 1282 (6th ed. 1990).

"Refuse" entails "an act of the will." *Id.* The terms "willfully" and "knowingly" are of equivalent meaning. *Jordan*, 218 Ill. 2d at 270 ("Willful conduct is synonymous with knowing conduct."); see *People v. Radford*, 2018 IL App (3d) 140404, ¶ 44, *aff'd*, 2020 IL 123975, ¶ 50; *cf.* 720 ILCS 5/4-5 (West 2018).

¶ 105    Thus, the trial court found that defendant was consciously aware not only that A.J. was at substantial risk of harm from his mother but also that defendant's investigation was insufficient. As such, the only reason defendant suffered from any alleged "dearth of knowledge" was due to his refusal to investigate the case or to listen to those who had interacted with A.J. Any uncertainty as to how A.J. was injured was due to defendant's willful refusal to comply with his statutory duties and, *inter alia*, have A.J. evaluated by someone who could determine with certainty how he had been harmed. Channon told defendant that she was not qualified to do such an evaluation and that he should take A.J. to someone who was. Defendant made a conscious choice to end the investigation prematurely and returned A.J. to Joann without conditions in spite of the evidence that this was practically certain to endanger his health, if not his life. Defendant cannot rely on his own conscious decision not to investigate further as a defense that he was unaware of the danger and so may evade responsibility for endangering A.J. See *People v. Penning*, 2021 IL App (3d) 190366, ¶ 25 (defendant knowingly caused child to be placed in circumstances that endangered his life or health when he made a conscious choice to inject heroin while he was caring for the child).

¶ 106    What defendant actually, subjectively knew was clear. It is undisputed that defendant was aware of a very large and dark bruise along A.J.'s upper right hip, as well as a small bruise on his

upper lip, accompanied by far-fetched and changing explanations for how they occurred. Defendant wrote up his observation of the bruising, as well as A.J's statement that the dog "put her paw on me," took photographs of these bruises at the police station, and discussed it with his supervisor and Dr. Channon. While Dr. Channon was not comfortable providing a definitive cause for A.J.'s bruising, she told defendant of the changing explanations by both A.J. and his mother, and she told defendant the bruises were not caused by a dog. Defendant was also aware that Dr. Channon had asked A.J. if he had been hit or spanked before, and A.J. said he had been hit with a belt. A.J. confirmed that a belt "made the mark," but he added that "maybe mommy didn't mean to hurt me." Defendant was obviously aware of these statements, as Dr. Channon's report containing this information was provided to him, yet he did not include it in his report. Dr. Channon also advised defendant that she felt that "potentially mom was the abuser" and offered defendant her opinion as to A.J.'s safety: "[W]e were not going to let the child leave the emergency room with mom." Defendant knew this, as he prevented Joann from taking A.J. home at that time. Dr. Channon also testified that she told defendant that the police officer at the hospital was concerned about the living conditions at A.J.'s home and had taken photos; defendant was also made aware of the condition of the house by Officer Shipbaugh. As a trained child protective investigator, defendant also knew that conflicting or changing explanations for injuries require further investigation and input from medical personnel. See Ill. Dep't of Child. & Fam. Servs., Procedures § 300.50(f)(1)(A) (2015). "As a rule, qualified physicians must verify whether explanations given for physical injuries are plausible." *Id.* § 300.50(f)(3)(B). Defendant was also clearly required to obtain a second medical opinion because Dr. Channon was "unable or unwilling to offer an opinion regarding the cause of injury." *Id.* § 300.100(g)(4)(A)(i).

¶ 107 Defendant was also indisputably aware of extensive evidence that Joann was actively abusing drugs. In *Penning*, the court found that "[i]llegal drug use by a parent or caregiver supports the conclusion that a child's physical and emotional well-being is endangered." *Penning*, 2021 IL App (3d) 190366, ¶ 27. The court explained that a caregiver's use of heroin exposes the child to various "inherent danger[s]," including neglect and "violent behavior by the drug user." *Id.* ¶ 25. Such exposure "poses an actual and appreciable danger to that [child] and thereby constitutes neglect." (Internal quotation marks omitted.) *Id.* ¶ 27. "Caregivers have been found guilty of child endangerment when they possess *or allow someone else* to possess illegal drugs in a home where children are present." (Emphasis added.) *Id.* ¶ 28. As the trial court found, evidence of Joann's continued drug use was clear enough that, when defendant returned A.J. to her custody, he was knowingly placing A.J. in a situation that was "inherently dangerous."

¶ 108 The fourth problem with defendant's argument concerns his claims that he merely made a "judgment call," which every DCFS investigator must do at various times, and that prosecuting him under these circumstances would essentially criminalize decisions that turn out to have been mistaken. However, despite the broad duty of DCFS child protective staff members to protect children, such workers should rarely be subject to criminal culpability for making discretionary removal or placement decisions. Such workers have other responsibilities and statutory duties. For example, in addition to protecting children from abuse and neglect, DCFS and its staff must also "stabilize the home environment, and preserve family life whenever possible." 325 ILCS 5/2(a) (West 2018). In recognition of these potentially conflicting duties, the duly promulgated DCFS rules, along with their corresponding internal procedures, are replete with factors for its personnel to consider in upholding the rights of alleged perpetrators of abuse, while at the same time ensuring the safety of the subject child(ren).

¶ 109    The difficulty of child protective work is also tacitly acknowledged by the applicability of qualified statutory immunity from both civil liability and criminal culpability, so long as the worker acts in "good faith."[9] *Id.* § 9; see *Falk v. Martel*, 210 Ill. App. 3d 557, 561-562 (1991) (discussing the scope of common law immunity of a DCFS investigator as a public official in the context of civil liability); *cf. Commonwealth v. Kiessling*, 343 A.3d 1234 (Pa. Super. Ct. 2025) (applying statutory immunity to child protective workers for felony charges alleging they failed to inform the court of the mother's pending drug and alcohol investigation, leading to the return of the baby to the mother, who murdered the child a week later). DCFS staff's required investigative and balancing considerations, combined with immunity protection, serve the laudable and necessary goal of protecting workers who make good faith mistakes in the course of their work, particularly in making discretionary decisions, or "judgment calls," as to such fraught matters as whether to take or extend protective custody of a child. Contrary to defendant's arguments here, however, this case did not involve a mere "judgment call."

¶ 110    We agree that, in most cases, a DCFS investigator's "judgment call" as to what steps should be taken to protect a child, as well as to preserve family unity to the extent possible, is entitled to great deference. However, where the record indicates that a DCFS child protective investigator has willfully violated his duties, misstated and omitted pertinent facts from official reports and

---

[9]Defendant has not presented any immunity arguments on appeal, presumably because of the lack of evidence he was acting in good faith, given his numerous violations of DCFS rules and procedures. But it is worth noting that immunity would likely have applied had defendant removed A.J. or extended temporary protective custody. The Act specifically provides immunity for decisions made in favor of taking protective custody of a child. See 325 ILCS 5/5 (West 2018); see also *supra* ¶ 8 n.4.

communications, and refused to investigate in accordance with statutory requirements, his "judgment call" is not an exercise of discretion at all and is not entitled to any such deference. Furthermore, defendant was not found guilty merely for refusing to investigate: the trial court found he refused to act to protect A.J. when he had a clear duty to do so and thereby subjected A.J. to a known and unreasonable likelihood of harm. Defendant's alleged lack of information was due only to his willful violation of his duties and did not serve to eliminate what he actually knew.

¶ 111                                    2. Proximate Cause

¶ 112   We next turn to the issue of proximate cause. Defendant argues that, even if we find that the State proved defendant knowingly endangered A.J.'s life or health, the State nonetheless failed to prove that defendant's failure to maintain protective care was the proximate cause of A.J.'s death. He asks in the alternative that we reduce his felony conviction to a misdemeanor and remand to the trial court for resentencing. Specifically, he contends that (1) the State was required to prove that A.J.'s death was foreseeable (and that the State failed to do so); (2) the State's evidence was speculative as to what would have happened had defendant placed A.J. in protective care; (3) defendant's return of A.J. to his mother's custody merely furnished a condition and that Joann's murder of A.J. was the sole proximate cause of A.J.'s death or, in the alternative, was the supervening cause; and (4) the passage of time between defendant's return of A.J. to Joann demonstrates that the causal link is too attenuated to be proximate.

¶ 113   Proximate cause is ordinarily a question for the trier of fact to resolve. *First Springfield Bank & Trust v. Galman*, 188 Ill. 2d 252, 257 (1999). Proximate cause consists of two elements: cause in fact and legal cause. *Id.* at 257-58. Cause in fact (also "but-for" causation) exists when defendant's conduct is a material element and a substantial factor in bringing about the injury. *Id.* Conduct is a material element and a substantial factor in bringing about an injury if, absent that

conduct, the injury would not have occurred. *Id.* at 258. (Defendant here contests the cause in fact requirement only to the extent that he argues the evidence at trial was speculative regarding what would have happened had defendant taken protective action, although his argument morphs into whether A.J.'s death was foreseeable, which is more an argument about legal cause.)

¶ 114   In contrast to cause in fact, legal cause is a question of foreseeability; the court must consider whether the injury is of a type that a reasonable person would see as a likely result of his or her conduct. *Id.* Foreseeability is added to the cause-in-fact requirement because " 'even when cause in fact is established, it must be determined that any variation between the result intended *** and the result actually achieved is not so extraordinary that it would be unfair to hold the defendant responsible for the actual result.' " *People v. Hudson*, 222 Ill. 2d 392, 401 (2006) (quoting 1 Wayne R. LaFave, Substantive Criminal Law § 6.4, at 464 (2d ed. 2003)).

¶ 115                    a. Foreseeability of Harm Versus Foreseeability of Death

¶ 116   Defendant first raises the issue of foreseeability in the context of the result of his conduct endangering A.J., arguing that culpability requires proof of foreseeability of *death*, not mere harm. Child endangerment resulting in no injury to the child is a Class A misdemeanor but rises to a Class 3 felony when the defendant's conduct is shown to be a proximate cause of the child's death. 720 ILCS 5/12C-5(d) (West 2018); *People v. Larson*, 2021 IL App (2d) 200185-U, ¶ 38 ("If the jury were to find that the State proved the two elements of child endangerment, but not that defendant's conduct proximately caused the death of E.L., then defendant would be convicted of a Class A misdemeanor version of child endangerment and sentenced accordingly."). While the fact of the child's death is a necessary element of the offense of endangering the life or health of a child in order to prove a felony, a misdemeanor conviction does not require that any actual injury occur. See *Wilkenson*, 262 Ill. App. 3d at 874-75. Thus, defendant's reasoning goes, in order to prove a

felony, the State must prove that A.J's death, not mere injury, was foreseeable to defendant. Defendant further argues that the State failed to prove that A.J.'s death was foreseeable and that, "[a]t most, perhaps a reasonable person could foresee a subsequent bruising incident."

¶ 117   We disagree. First, the trial court specifically found that A.J.'s death was foreseeable. See *supra* ¶ 74. Even if the trier of fact hadn't made such a finding, however, the proximate cause requirement of "foreseeability" does not require that the person charged with the crime foresee either the extent of the injury (such as death) or the exact way in which it occurs. *People v. Kidd*, 2013 IL App (2d) 120088, ¶ 32; *People v. Cook*, 2011 IL App (4th) 090875, ¶ 18. Rather, foreseeability of harm is sufficient. *Kidd*, 2013 IL App (2d) 120088, ¶ 32; see also *State v. Riggs*, 2 S.W.3d 867, 873 (Mo. Ct. App. 1999). In *Riggs*, the Missouri Court of Appeals held that

> "the state need not prove [defendant] was practically certain that [her child]'s *death* would occur as a result of her failure to provide supervision. Rather, for a charge of child endangerment, the state must prove [defendant] knew her failure to provide proper supervision for her two-year-old child for some forty-five minutes was practically certain to *endanger* the child." (Emphases in original.) *Riggs*, 2 S.W.3d at 873.

*Cf. State v. Fuelling*, 145 S.W.3d 464, 469-70 (Mo. Ct. App. 2004) (holding that the state had presented sufficient evidence that defendant's conduct was "practically certain to *endanger* the child," not that death would result (emphasis in original and internal quotation marks omitted)). We find this reasoning persuasive. *Cf. People v. Nelson*, 2020 IL App (1st) 151960, ¶ 128 ("the question is whether the successive, immediate cause is of a *type* that a reasonable person would see as a likely result of his or her conduct." (emphasis in original and internal quotation marks omitted)).

¶ 118          b. The State's Evidence Was Not Merely Speculative

¶ 119   We believe the evidence was sufficient to allow a rational trier of fact to conclude that defendant's conduct of knowingly permitting A.J.'s life to be endangered was a proximate cause of A.J.'s death. First, defendant's conduct was the cause in fact of A.J.'s death because defendant's conduct was both a material element and a substantial factor in bringing about A.J.'s death. Both Ruzicka, who worked for more than 30 years for DCFS, and Soter, a forensic pediatrician who trained DCFS workers on identifying child abuse, testified that if DCFS protocols had been followed and defendant had taken protective action for A.J., then the services DCFS provides would have prevented A.J.'s death in April 2019. Both Wells and Almeida corroborated this assessment as they testified that if the state's attorney's office had been contacted regarding the December 18, 2018, incident, the State would have petitioned to obtain a temporary custody hearing. Wells testified that, based on the evidence in the case, this would have resulted in temporary custody being taken of A.J. pending the completion of the investigation and an adjudicatory hearing. Wells further testified that, based on the outcome of such an investigation, either the trial court would not have returned A.J to his home or it would have returned A.J. with conditions. Such conditions would have required regular interactions with child welfare workers. Under either situation, Wells believed that A.J. would not have been murdered in April 2019. This testimony provided ample evidence for the trial court to find that defendant's conduct of terminating protective custody of A.J. and then closing the case as unfounded was a but-for cause of A.J.'s death, in that it was both a material element and substantial factor in the chain of events that led to A.J.'s death.

¶ 120   Second, defendant's conduct was also the legal cause of A.J.'s death because it was foreseeable that if defendant did not take action to protect A.J. from Joann, she would continue to

harm A.J. As we previously noted, at the time of his investigation in December 2018, defendant knew that Joann had two prior involvements with DCFS. The first involvement began in October 2013 and lasted approximately two and a half years. That case was initiated because A.J. was born with drugs in his system and Joann had a history of heroin abuse. The second involvement was in March 2018 and involved Joann's continued heroin use, her admission that she had relapsed, unexplained bruising on A.J., and the boys' inappropriate, unclean attire. Third, in the instant case in December 2018, defendant knew from Shipbaugh that (1) Joann "looked like a heroin addict" and was using a drug that is used by heroin addicts; (2) Joann and her children were living in a house that was in disrepair, in disgusting condition, and unsafe for children; and (3) A.J. had a "horrific" bruise that had almost certainly been caused by Joann. As previously noted (*supra* ¶ 107), even the use of illegal drugs alone is endangering, and the trial court found the living situation to be "inherently dangerous." From Channon, defendant knew that A.J. had implicated Joann as being the person that had inflicted the bruise upon him. Channon told defendant this, and defendant did not include it in either his written report or the text (with the photo of A.J.'s bruise) that he sent to his supervisor.[10] Moreover, as discussed earlier, because defendant lied in his report about the violence that had been present in A.J.'s home, it is apparent that defendant was consciously aware of the danger A.J. would encounter if he was not removed from the home. Based on all these circumstances, the trial court could rationally determine that it was foreseeable to defendant that if A.J. was not placed in protective custody, Joann would continue to harm him.

---

[10]The trial court cited this material omission, among other instances of defendant's unreliability, in acquitting Polovin. In its finding, the court found that defendant was "not a reliable reporter of what he is doing [and] makes material omissions," and therefore acquitted Polovin, telling him it was "because I don't know exactly what you knew and when you knew it."

¶ 121　In so ruling, we reject defendant's arguments that the trial court erred in relying on the State's allegedly speculative evidence and overlooking evidence that supported his decision not to place A.J. in protective care. First, the State's evidence regarding what would have happened had defendant placed A.J. in protective care was not based on mere speculation. Wells, Almeida, Ruzicka, and Soter all explained the child protective custody process. Following a hearing, DCFS could maintain protective custody of the child. If DCFS opted not to assume protective custody, it could still place the child in a safety plan and have the child seen regularly by people from outside the home, such as DCFS caseworkers or a GAL. If defendant had placed A.J. in protective care, the trial court could reasonably conclude that Joann would not have been in a position where she would have been able to murder A.J. four months after the December 2018 incident. See *Weisman v. Schiller, Ducanto & Fleck, Ltd.*, 368 Ill. App. 3d 41, 56 (2006) (testimony was not "speculative" as it provided factual considerations of malpractice case based on the existing law at the time).

¶ 122　Second, although there was some evidence that arguably supported defendant's decision not to place A.J. in protective care, it was within the trial court's discretion to place greater weight on the evidence that defendant had knowingly placed A.J. in harm's way. *Gaines*, 2020 IL App (2d) 180217, ¶ 56.

¶ 123　　　　　　　　　　c. Condition Versus Cause, Supervening Cause

¶ 124　Further, just because defendant was not the person who killed A.J. does not mean that his actions could not have been a proximate cause of A.J.'s death. See *People v. Swift*, 2016 IL App (3d) 140604, ¶ 51 (there may be more than one proximate cause to an injury).

¶ 125　Defendant first argues that his decision to return A.J. to Joann's custody merely furnished a condition for Joann's subsequent, independent act of murder. If defendant's actions did " 'nothing more than furnish a condition by which the injury is made possible, and that condition causes an

- 45 -

injury by the subsequent, independent act of a third person, the creation of the condition is not the proximate cause of the injury.' " *People v. Mumaugh*, 2018 IL App (3d) 140961, ¶ 29 (quoting *Galman*, 188 Ill. 2d at 257). However, the test is whether defendant "reasonably might have anticipated the intervening efficient cause as a natural and probable result of the first party's own [wrongful act]." (Internal quotation marks omitted.) See *id.* Given the evidence presented about Joann's mental health, drug abuse, and violence toward A.J., the trier of fact was justified in finding that defendant reasonably might have anticipated Joann's subsequent violence toward A.J.

¶ 126   Second, defendant is correct that a third party's intentional "maltreatment" of the victim can constitute a "supervening, intervening, or superseding cause" that breaks the proximate cause chain. *People v. Domagala*, 2013 IL 113688, ¶ 39. However, for that supervening event to break the proximate cause chain, that "new causal factor" must be completely unrelated to or unconnected with defendant's conduct. *Nelson*, 2020 IL App (1st) 151960, ¶ 52. To satisfy the proximate cause requirement that the death did not result from a cause unconnected with defendant, the State must prove that the result that actually occurs (death) is "enough similar to, and occur[s] in a manner enough similar to, the result or manner which the defendant intended *** that the defendant may fairly be held responsible for the actual result." (Internal quotation marks omitted.) *People v. Nere*, 2018 IL 122566, ¶ 31. In other words, the death and the way it occurred must be something that a reasonable person would foresee in the natural sequence of events put into motion by the defendant's conduct. *Nelson*, 2020 IL App (1st) 151960, ¶ 126. The question is "whether the successive, immediate cause is of a *type* that a reasonable person would see as a likely result of his or her conduct." (Emphasis in original and internal quotation marks omitted.) *Id.* ¶ 128. Supervening criminal conduct for which the defendant is not responsible may be considered as a reason to find that the proximate cause element was not proven. *Id.* ¶¶ 52, 130. However, the

converse is also true: "[W]hen criminal acts of the defendant have contributed to a person's death, the defendant may be found guilty." (Internal quotation marks omitted.) *Nere*, 2018 IL 122566, ¶ 32. The fact finder must determine whether "these types of acts or events were sufficiently foreseeable that it would be fair to hold defendant criminally responsible." *Nelson*, 2020 IL App (1st) 151960, ¶ 130.

¶ 127   Here, the chain of events ultimately causing A.J.'s death was set in motion by the conduct of defendant, in spite of strong evidence that Joann had acted—and would continue to act—in such a way as to harm A.J. Had defendant taken protective custody of A.J. on December 18, 2018, or properly referred the case before closing it, the trajectory of this case would have changed, and A.J. would not have been in a situation where his mother could kill him a few months later. Defendant's actions therefore were not completely unrelated to the cause of A.J.'s death.

¶ 128                                              d. Passage of Time

¶ 129   Finally, the mere passage of time does not, in and of itself, break the proximate cause chain. *Id.* ¶¶ 1, 3, 151 (reviewing court determined that State's evidence as to proximate cause was sufficient where victim died five years after being injured by the defendant); *People v. Mudd*, 154 Ill. App. 3d 808, 809 (1987) (three years); *People v. Harrison*, 395 Ill. 463, 465 (1946) (eight months); see *United States v. Jackson*, 528 A.2d 1211, 1212 (D.C. 1987) (fourteen months); *cf. Colonial Inn Motor Lodge, Inc. v. Gay*, 288 Ill. App. 3d 32, 45 (1997) (civil case in which decedent died nine months after injury: "Neither a high degree of contingency nor a substantial lapse of time between the negligent act and the injury establishes as a matter of law that the former did not proximately cause the latter"). Here, the passage of three months from defendant's closure of the case (or four months from defendant's termination of temporary protective custody) to A.J.'s death is not so long as to eliminate the foreseeability of harm.

¶ 130                        III. CONCLUSION

¶ 131   Defendant had a duty to protect A.J. and had sufficient information and authority to take action—indeed was uniquely positioned to do so—yet knowingly placed A.J. in inherently dangerous circumstances. The State proved beyond a reasonable doubt that defendant knew that Joann was likely beating A.J. and certainly neglecting his care and that, despite knowing that A.J. was practically certain to be harmed, defendant nonetheless unconditionally returned A.J. to Joann's care and closed the case, which was a proximate cause of A.J.'s death.

¶ 132   For the foregoing reasons, we affirm the judgment of the circuit court of McHenry County.

¶ 133   Affirmed.

*People v. Acosta*, 2026 IL App (2d) 240364

| | |
|---|---|
| **Decision Under Review:** | Appeal from the Circuit Court of McHenry County, No. 20-CF-703; the Hon. George D. Strickland, Judge, presiding. |
| **Attorneys for Appellant:** | James E. Chadd, Christopher McCoy, and Lucas Walker, of State Appellate Defender's Office, of Elgin, for appellant. |
| **Attorneys for Appellee:** | Randi Freese, State's Attorney, of Woodstock (Patrick Delfino, Thomas D. Arado, and Laura Bialon, of State's Attorneys Appellate Prosecutor's Office, of counsel), for the People. |